CENTENNIAL STATE BANK, Appellant,

v.

S. E. K. CONSTRUCTION CO., INC., and
John L. and Ruth E. Polston,
Respondents,

and

Fireman's Fund Insurance Company,
Appellant.

Nos. 26538, 26544.

Missouri Court of Appeals,
Kansas City District.

Dec. 30, 1974.

Jerome T. Wolf, Spencer, Fane, Britt & Browne, F. Philip Kirwan, Robert A. Bab-cock, Margolin & Kirwan, Kansas City, for appellants.

Richard W. Miller, George T. O'Laughlin, William E. Simmons and Miller & O'Laughlin, P. C., Kansas City, for respondents.

Before DIXON, C. J., and SHANGLER, WASSERSTROM and TURNAGE, JJ.

TURNAGE, Judge.

This action was commenced by Centennial State Bank (Centennial) against S.E.K. Construction Company, Inc. (S.E.K.) and John L. Polston and Ruth E. Polston (Polstons). Fireman's Fund Insurance Company (Fireman's) intervened in such suit, and thereafter the Polstons filed a crossclaim against Fireman's.

The original litigation was brought by Centennial after Centennial had taken an assignment of a promissory note and security agreement executed by S.E.K. to Commercial Credit Industrial Corporation (CCIC). S.E.K. originally executed a promissory note to CCIC in the amount of $124,999.08. The Polstons were stockholders in S.E.K., and at the request of CCIC delivered to CCIC their personal guarantee of the promissory note given by S.E.K. Prior to the Polstons giving their personal guarantee to CCIC, the Polstons had caused to be given a guarantee by Modern Methods, Inc., a corporation in which the Polstons were the sole stockholders.

The promissory note given to CCIC was secured by a security agreement on certain road building equipment.

S.E.K. also made and delivered its promissory note to Centennial and gave a security agreement to secure the same, which covered the same road building equipment as the security agreement given to CCIC. By a subordination agreement, the Centennial note and security agreement were made subordinate to the CCIC note and security agreement with the result that

CCIC had a first lien on the S.E.K. equipment and Centennial held the second lien.

Subsequent to the giving of these notes and security agreements, S.E.K. was involved in a road building project in the State of Oklahoma. Fireman's was the surety on a performance bond given by S. E.K. in connection with such road building project.

After becoming engaged in the Oklahoma road building endeavor, S.E.K. defaulted on the payments due on the CCIC note and apparently also on the Centennial note. The Industrial State Bank of Kansas City, Kansas (Industrial) also held a promissory note executed by S.E.K. and secured by a security agreement given on other road building equipment which was not covered by the CCIC and Centennial security agreements.

Apparently at the time of falling into default on the Centennial and CCIC notes, S.E.K. also defaulted on the Industrial note. In an attempt to protect their security and to begin efforts toward collecting their notes, Centennial and Industrial sent representatives to Oklahoma to begin repossession of the road building equipment covered by their security agreements. Since the Centennial security agreement covered the same equipment as the CCIC security agreement, Centennial, through its attorney, Arthur Doyle, maintained close contact with CCIC in Baltimore, Maryland. Mr. Doyle kept CCIC fully informed of the efforts which Centennial and Industrial were making in the repossession of the equipment, and although CCIC made no objection to these repossession efforts, there does not appear to be any evidence to show that CCIC in any way instigated those repossession efforts, or did more than simply receive reports concerning this activity. Mr. Doyle testified the repossession was made on behalf of CCIC, Centennial and Industrial, as their interests appeared.

Before Centennial and Industrial could repossess the equipment, Fireman's instituted an injunction suit in the federal court in Oklahoma seeking to prevent this repossession. Centennial and Industrial, through the efforts of Mr. Doyle, was able to have this injunction suit dismissed.

In connection with the conclusion of the Oklahoma litigation, Fireman's entered into an agreement with the Polstons by which Fireman's agreed to protect, defend and indemnify John L. Polston and Ruth E. Polston as respects their guarantee given to CCIC for the balance due CCIC on the equipment covered by its security agreement.

Thereafter, the equipment was segregated with reference to that which was covered by the Centennial and CCIC security agreements and that covered by the Industrial security agreement. The equipment was thus brought to Kansas City.

Centennial had made the decision to purchase the CCIC note, and about the time the equipment was moved to Kansas City, Mr. Doyle obtained the payoff figure from CCIC. CCIC gave this figure as being $55,408.70, which, as stated in the assignment to Centennial, represented the remaining amount presently owed CCIC under the promissory note and chattel mortgages, discounting unearned interest and past due charges. Centennial paid the $55,408.70 to CCIC and took an assignment from CCIC. The assignment given by CCIC to Centennial covered the original promissory note given to it by S.E.K., various chattel mortgages (sic) given to secure the payment of said note, and the guarantees given by Modern Methods and the Polstons to CCIC for the payment of the S.E.K. note.

At about the time Centennial was obtaining the assignment of the note and other documents from CCIC, Centennial gave notice to the Polstons, Modern Methods and Fireman's of the impending foreclosure sale of the equipment covered by the first lien given to CCIC. After obtaining the assignment, Centennial proceeded with the sale of the equipment under the first

lien which it had acquired and obtained the sum of $55,408.70 at such sale, being the same amount Centennial had paid CCIC.

After such sale, Centennial calculated the expenses which were incurred in repossessing the equipment in Oklahoma and returning it to Kansas City, and in connection with the sale, as being $7,961.86. Centennial further calculated the attorney fees which it had incurred for the same purposes, as being $8,311.30. Thereafter, Centennial instituted this suit against S.E.K. and the Polstons for the sum of $16,273.16, which was the total of the attorney fees and expenses incurred in the repossession, moving of the equipment and its sale. This suit was based on the allegation these expenses were properly deducted from the proceeds of the sale before applying such proceeds to the balance due. The petition then alleged a deficiency existed in the amount of such expenses.

Additional facts bearing on the controversy between the Polstons and Fireman's will be developed in the disposition of the appeal by Fireman's.

After a hearing by the court without a jury, the Court entered findings of fact and conclusions of law, resulting in a judgment for S.E.K. and the Polstons on the claim by Centennial, and in favor of the Polstons against Fireman's for attorney fees incurred by the Polstons in defending the suit brought by Centennial. Centennial appealed from the judgment denying its claim, and Fireman's appealed from the judgment against it in favor of the Polstons.

These appeals have been consolidated and in an attempt to bring some clarity out of this rather confusing situation, these appeals will be discussed separately.

## CENTENNIAL APPEAL [1]

The theory of the Centennial claim against S.E.K. and the Polstons was that Centennial had the right to deduct from the proceeds of the sale of the equipment following its repossession, the expenses and attorney fees incurred in connection with the repossession and sale of such equipment. In making such claim, Centennial relies on § 400.9–504 RSMo 1969, V.A.M.S. which is a part of the Uniform Commercial Code. This Section provides in part as follows:

(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the article on sales (article 2). The proceeds of disposition shall be applied in the order following to

(a) the reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorney fees and legal expenses incurred by the secured party;

(b) the satisfaction of indebtedness secured by the security interest under which the disposition is made;

(c) the satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

Centennial argues under this Section it is entitled to deduct the expenses and attorney fees, even though these were incurred prior to the time Centennial became the owner of the CCIC note and security

1. S.E.K. and Polstons have filed a motion to dismiss both appeals for deficiency in both appellant's briefs. This motion is overruled.

agreement under which the sale was actually made. Centennial urges it is absolutely entitled to deduct such amounts under the plain terms of this Section regardless of any other fact or circumstance. No cases applicable to the facts here under this Section has been cited, and independent research reveals none. In making this argument, Centennial overlooks the fact that under this Section of the Uniform Commercial Code, the party entitled to deduct the amounts referred to is the secured party. In this litigation, CCIC was the secured party under the note and security agreement given it, which was later assigned to Centennial, and under which security agreement Centennial made the sale. By taking an assignment from CCIC, Centennial simply stepped into the shoes of CCIC and acquired whatever rights CCIC had at the time the assignment was made. Securities Inv. Co. v. International Shoe Co., 5 S.W.2d 682 (Mo.App.1928). At the time CCIC assigned this note to Centennial, CCIC had no claim for expenses and attorney fees incurred in the repossession and sale of the equipment. Thus, Centennial acquired no right to such expenses in accepting the assignment.

It must be remembered Centennial had a second lien on the same equipment as was covered by the CCIC security agreement, and these two liens on the same equipment retained their separate identities even though both became the property of Centennial.

The Uniform Commercial Code does not change the prior law unless specifically done so by provisions of the Code, § 400.-1–103. Thus, the law of assignment remains in full force and effect as applied to the Code, since there is no provision in the Code abrogating or modifying the general law concerning assignments.

This is further buttressed by § 400.9–105 in which "secured party" is defined and the comment to that Section states "the term is used equally to refer to a person who, as a seller, retains a lien or title to

goods sold; to a person whose interest arises initially from a loan transaction; and to an assignee of either".

■■ It is too well settled to admit of any argument that an assignee acquires no greater rights against the debtor than the assignor had against him at the time of the assignment. Securities Inv. Co. v. International Shoe Co., supra. This being so, Centennial could not assert any claim against S.E.K. or the Polstons under the CCIC note which CCIC did not have since under such note Centennial only acquired the rights owned by CCIC at the time of the assignment. There is no question that CCIC had no claim for expenses connected with the repossession and sale or attorney fees for such purposes. These expenses were all incurred by Centennial. By stepping into the shoes of CCIC, Centennial only acquired the right to recover the sum of $55,408.70, the amount due CCIC, and having received that amount from the proceeds of the sale, the total obligation of the CCIC note was met. This being the case, Centennial, as the assignee, received the full amount due CCIC. Since CCIC had not incurred any expenses of repossession and sale, Centennial acquired no rights for such expenses under this assignment. Whatever other rights Centennial had against S.E.K. or the Polstons would not be attributable to the CCIC note, but would have to arise under the Centennial note which retained its separate identity.

Under this factual situation, the Uniform Commercial Code would not authorize the deduction of the expenses of repossession and sale and attorney fees connected therewith from the proceeds of the sale of the security.

Leaving the Uniform Commercial Code Centennial further argues that CCIC acquiesced in the repossession and sale of the secured equipment and accepted the benefits of such. It further makes some contention that in its activities in the repossession, Centennial also acted as the agent of CCIC.

■ It is beyond question that a principal-agent relationship may be created by the conduct of the parties without any express oral or written appointment. This is referred to as an implied agency.

■ However, an implied agency must be based on "facts for which the principal is responsible; they must, in the absence of estoppel, be such as to imply an intention to create the agency, and the implication must arise from a natural and reasonable, and not from a forced, strained, or distorted, construction of them". Carver v. Farmers & Bankers Broadcasting Corp., 162 Kan. 663, 179 P.2d 195 (1947).

■ Here there was no evidence of any acts on the part of CCIC which could form the basis of an implied agency; all of the acts were performed by Centennial and CCIC simply sat back and let Centennial go ahead with its repossession efforts. Furthermore, the contention of agency is rebutted by letter from CCIC to Centennial in which CCIC stated that Centennial had taken possession of the equipment under its junior lien. To find an agency from this record would indeed be a forced or distorted construction of the facts.

■ Centennial then makes the contradictory argument that once the assignment was in its hand, it then ratified its own acts and this ratification relates back to the time of the repossession which in turn made the repossession authorized at the time it was made. In this argument, Centennial ignores the fact that ratification is the express or implied adoption or confirmation by one person of an act performed in his behalf by another, who at the time assumed to act as his agent but lacked authority to do so. Fritsch v. National City Bank, 24 S.W.2d 1066 (Mo.App.1930).

■ The result of this argument is to have Centennial contending that it could ratify its own acts. To call forth the doctrine of ratification, of necessity, assumes that Centennial was acting without authority at the time it expended funds to accomplish the repossession. It is clear Centennial cannot claim to be the agent at the time the expenditure for repossession was made, and at the same time claim ratification. Centennial cannot ratify its own acts; the ratification would have to come from CCIC. As pointed out above, Centennial did not prove any agency at the time the repossession expenses were incurred, and thus these arguments, even though contradictory, must both fail.

Centennial next makes several arguments which have been answered by what has heretofore been said. It argues that it was not bound by the statement in the assignment that $55,408.70 represented the amount presently owing CCIC. It is not necessary to decide whether or not Centennial is actually bound by such statement in view of what has been said concerning the absence of a right in Centennial to claim repossession expenses and resulting attorney fees under the CCIC note. This also holds true for the argument as to whether or not the Polstons are responsible for attorney fees and costs of the repossession under their guarantee given to CCIC; or whether or not Missouri or Maryland law applies.

For the foregoing reasons, Centennial had no claim under the CCIC note against S.E.K. or the Polstons for repossession expenses and attorney fees. The judgment of the trial court in favor of S.E.K. and the Polstons on the claim made by Centennial must, therefore, be affirmed.

## FIREMAN'S FUND APPEAL

After Centennial filed its suit, Fireman's intervened in such suit. Fireman's alleged the execution of an agreement between it and the Polstons on May 2, 1968, by which Fireman's agreed to protect, defend and indemnify the Polstons as respects their guarantee given to CCIC. Fireman's further alleged the Polstons were not served with process in the Centennial suit, but they voluntarily entered their appearance

without disclosing such fact to Fireman's; and further, Polstons failed to disclose to Fireman's the existence of a guarantee executed by Modern Methods to CCIC prior to the guarantee given by Polstons to CCIC.

Fireman's alleged, and thereafter claimed, the guarantee given by Modern Methods was the only valid guarantee in existence and the guarantee executed by Polstons to CCIC, given some ten days after the execution of the note, was given without consideration and was, therefore, void.

Fireman's thus alleged bad faith on the part of the Polstons in the above actions and prayed that the court declare Fireman's was not obligated to defend or indemnify Polstons on Centennial's suit.

Polstons filed a cross-claim against Fireman's for their costs and expenses, including attorney fees, incurred in defending the claim of Centennial.

With respect to the issue raised by Fireman's of the bad faith on the part of Polstons in entering their appearance in the Centennial suit, the trial court in its findings of fact found the Polstons had entered their appearance because the Polstons, while residing in Lawrence, Kansas, had a place of business in Independence, Missouri, and that Mr. Polston was at such place of business daily, with Mrs. Polston being there at times, and that the Polstons did not wish Mrs. Polston to be upset by the sheriff serving her; and the CCIC note and security agreement were executed by the Polstons in Missouri. While the trial court did not make an explicit finding of good faith on the part of the Polstons in entering their appearance, Fireman's of necessity urges that such action was evidence of bad faith. It is obvious, however, that implicit in the findings of the trial court is a finding the Polstons were not acting in bad faith nor in collusion with Centennial in entering their appearance.

Despite this finding by the trial court, Fireman's insist the voluntary appearance by the Polstons in the lawsuit represents in and of itself bad faith. The only case in Missouri which appears to have dealt with this question is Ems v. Continental Auto Ins. Ass'n, 284 S.W. 824 (Mo.App.1926). In that case the insurance company contended its insured was guilty of bad faith in going to the office of the claimant's attorney by appointment, and the insured was served with process while waiting to see the attorney. The company there contended the fact the insured, a resident of Illinois, went to the office of claimant's attorney in Missouri when his visit there was anticipated, proved the insured was guilty of bad faith in cooperating so that service upon him in Missouri could be obtained.

The insured denied he had any bad faith intentions, and the court held the question of whether or not the insured failed to cooperate with his company was a jury question.

In this case, the Polstons deny acting in bad faith, or colluding with Centennial in making their entry of appearance. Mr. Polston stated he lived in Lawrence, Kansas, but had his business office in Independence, Missouri, and was there almost every day so he was amenable to service in Jackson County, Missouri, almost daily. There was no contrary evidence, and the trial court resolved this issue adverse to Fireman's.

The entry of appearance or submission to service of process is not generally held to constitute bad faith in the absence of a finding of bad faith or collusion. 14 Couch on Insurance 2d, § 51:183, 66 A.L.R.2d 1238. As stated in 66 A.L.R.2d 1239, "the principle most clearly appearing from the cases being that it may be a breach of a cooperation clause for an insured to collude with those claiming damages against him in voluntarily submitting to service of process in a place where he would not otherwise be amenable to suit".

While the case at bar does not involve an automobile insurance policy, the same principles are applicable.

In addition to their voluntary appearance, Fireman's points to a lawsuit originally filed by Centennial naming Modern Methods as a defendant, but dismissed after conversation between Mr. Doyle and Mr. Miller, representing Polstons. It appeared Mr. Miller stated the Modern Methods' guarantee was replaced by the Polstons' guarantee, and Mr. Doyle then dismissed the first suit. The suit filed resulting in this appeal did not name Modern Methods.

■ Fireman's cites a number of cases on the general principle that the indemnitor will be discharged from liability if the indemnitee breaches its duty of good faith in such a way to increase the indemnitor's risk or liability or otherwise prejudice the indemnitor's rights or remedies. This general principle is undoubtedly true, but the trial court did not find any collusion or bad faith on the part of the Polstons.

A review of the evidence does not reveal the finding of the trial court that the Polstons' guarantee in fact, and not as a sham, replaced the Modern Methods' guarantee, and the reasons for the entry of appearance to be good, to be erroneous. Bearing in mind the superior opportunity of the trial court to see and observe the witnesses, it may not be said that such ruling is contrary to the weight of the evidence. In that situation, such finding by the trial court cannot be disturbed. Rule 73.01(d), V.A.M.R.

■ Fireman's also contends the guarantee of the Polstons was void for lack of consideration because it was given ten days after the execution of the promissory note by S.E.K. It was also contended the guarantee of Modern Methods, which was given prior to the Polstons' guarantee, was fully valid and was the only enforceable guarantee in existence. Fireman's thus concludes the Polstons had a valid defense on their guarantee in lack of consideration, and faults Polstons for failing to raise this defense. Mr. Polston testified the personal guarantee given by him

and his wife was in substitution of the Modern Methods' guarantee and the trial court so found. Fireman's denies this, but does not point to any substantial evidence to show the contrary.

However, even if the substitution be ignored, it does not follow that the guarantee given by the Polstons was void for lack of consideration simply because it was given ten days after the promissory note it guaranteed. In Chester Airport, Inc., v. Aeroflex Corporation, 37 Misc.2d 145, 237 N.Y. S.2d 752 (1962) it was held the giving of a guarantee six days after the execution of a lease would be considered to have been given contemporaneously with the lease even though not given on the same day. The same result was reached in McMillan v. Lane Wood & Company, 361 P.2d 487 (Okl.1961). In both of these cases it was held the guarantee given subsequent to the main obligation was not void for want of consideration simply because given a few days later.

It is stated in 17 Am.Jur.2d Contracts § 90: "It is the general rule that a consideration for a contract need not be recited or expressed in writing, since, if not expressed, consideration may be implied by or inferred from the terms and obvious import of the contract". Here, the Polstons had a substantial stock ownership in S.E.K. and were the sole owners of Modern Methods. There was some evidence the Modern Methods' guarantee was in fact given by mistake. In this situation, it is apparent the consideration for the guarantee given by the Polstons was the making of the loan to S.E.K. In the circumstances present here, it is clear the Polstons' guarantee can be said to be contemporaneous with the execution of the promissory note, even though not given on the same day and was supported by a valid consideration.

The trial court found such substitution had been made, again this finding is not clearly erroneous. The Polstons' guarantee replaced the Modern Methods' guarantee so they would not have had any right

to insist upon Modern Methods indemnifying them. For this reason, the Polstons were not obligated to serve any notice upon Modern Methods as required by §§ 433.010, 433.020 and 433.030 RSMo 1969, V.A.M.S.

The Polstons' guarantee was thus valid, and Fireman's had no defense based upon a void guarantee running from the Polstons to CCIC, or to Centennial after the assignment.

The trial court entered judgment in favor of the Polstons and against Fireman's for $3,873.00 for attorney fees incurred by the Polstons in defending the action brought against them by Centennial. Fireman's argues such award is unjustified because Fireman's offered to defend the Polstons, with the understanding, however, that Fireman's was not waiving any defenses which it had as to its obligation to indemnify and defend the Polstons. The Polstons refused to allow Fireman's to represent them, and obtained counsel of their own choice, on the grounds that Fireman's was in an adversary position and could not possibly represent the Polstons with any degree of undivided allegiance.

By filing its intervening petition alleging it was not liable to the Polstons for either indemnity or defense, there can be no doubt Fireman's took an adversary position to the Polstons. The filing of such intervening petition constituted a denial by Fireman's of any duty or obligation to the Polstons. Its intervening petition stated as much. This was a denial to the Polstons of Fireman's responsibility to defend the Centennial suit.

██ It is beyond question that upon the refusal of an insurer to defend its insured, the insurer becomes liable for the insured's attorney fees in defending an action. 14 Couch on Insurance 2d, § 51:57. This is also the holding in Bituminous Casualty Corporation v. Walsh & Wells, Inc., 170 S.W.2d 117 (Mo.App.1943). The same rule applies to the agreement made between Fireman's and the Polstons here, so the refusal of Fireman's to defend the Polstons fastens liability upon Fireman's for attorney fees incurred by the Polstons in defending the claim brought by Centennial under its assignment from CCIC. Fireman's is, therefore, liable for the Polstons' attorney fees in defending against the claim of Centennial.

Fireman's raises only the propriety of the judgment for attorney fees, but not the amount. In that situation, the amount found by the trial court must be found to be reasonable. Having denied its duty to defend, Fireman's later statement to the Polstons that it would defend them did not amount to a repudiation of the position taken in the intervening petition. Finding themselves defending a claim by Centennial, and also a claim by their own indemnitor, the Polstons were justified in retaining their own attorney. The judgment of the trial court for attorney fees against Fireman's was correct.

The Polstons have filed a motion in this court asking for their attorney fees incurred in resisting the appeal filed by Centennial against them. Polstons' attorneys have filed an affidavit, together with an itemized bill directed to the Polstons, showing a total attorney fee incurred after the judgment in the trial court of $4,039.-25, plus $189.16 as the pro-rata cost of the brief filed in this court on behalf of the Polstons. Fireman's attorneys have filed a counter-affidavit disputing the claim of the Polstons' attorneys concerning the respective efforts put forth by each party's attorneys on this appeal. Fireman's attorneys admit if any attorney fees are awarded to Polstons, the sum of $2,400.00 would be reasonable.

"[The] courts are themselves experts on the subject of attorneys' fees, . . . and this expertise extends to the value of appellate services", Cascio v. Cascio, 485 S.W.2d 857 (Mo.App.1972).

Fireman's is responsible for attorney fees incurred by Polstons on this appeal on the same grounds set out above relating to

fees in the trial court. After careful review of the amount of time expended by Polstons' counsel, the complexity of the issues presented, and the entire circumstances of this appeal, this court finds the reasonable attorney fees for Polstons' counsel on appeal to be $3,500.00, plus $189.16 as the pro-rata cost of Polstons' brief in this court.

The judgment of the trial court is affirmed and the cause is remanded to the trial court with directions to enter an additional judgment in favor of the Polstons and against Fireman's in the total amount of $3,689.16.

All concur.