**SPRINGFIELD TELEVISION, INC., A Missouri Corporation, Plaintiff-Respondent,**

v.

**W. A. GARY and Linda Sue Gary, Individually and engaged in d/b/a Casa Grande Mobile Homes, Defendants-Appellants.**

No. 12364.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 27, 1982.

Douglas W. Greene, III, Hamra, Greene, Johnson & Sweeney, Springfield, for defendants-appellants.

Dee Wampler, Wampler & Wampler, Lester Barry Cox, Springfield, for plaintiff-respondent.

BILLINGS, Judge.

Plaintiff television broadcasting company brought this suit for monies due for television advertising for Casa Grande Mobile Homes. Defendants were a Texas married couple, W. A. Gary and Sue Gary, "Individually and engaged in d/b/a Casa Grande Mobile Homes," and a Texas corporation, Texana Casa Grande, Inc.[1] Trial was to the court and judgment entered against the Garys. Because we have concluded that critical factual determinations are unsupported by substantial evidence and the court erred in its application of the law to the facts [*Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976)] we reverse and remand.

Defendants W. A. and Sue Gary are residents of the State of Texas. The Garys and a Ted Endicott caused a Texas corporation to be formed in early 1977 known as Texana Casa Grande, Inc. Endicott was president, W. A. Gary was vice president and Mrs. Gary was named as secretary and treasurer. The three constituted the board of directors and apparently were the only shareholders. Pursuant to a plan to conduct a mobile home sales business in Springfield, Missouri, the corporation was granted a Missouri Certificate of Authority to do business on May 23, 1977. There is no evidence the corporation ever registered any name for the doing of business in Missouri other than the true name of the corporation shown in the Certificate of Authority.

The evidence indicates the Garys loaned large amounts of money to the ill-destined corporation, with Endicott acting as manager for the daily operation of the business. W. A. Gary testified he first came to Springfield in connection with the anticipated business in January or February, 1977, the first of a half dozen or so trips he made. The totality of the evidence concerning Mrs. Gary's involvement with the Springfield operation was that she came to Missouri twice and signed a guaranty agreement to Commerce Bank.

A sign was erected at the business address in Springfield advising the presence of "Casa Grande Mobile Homes." The evidence associates no person but Endicott with the sign. During the approximately seven months' duration of the business, Endicott engaged in customary managerial activities, including the initiation of television advertising for the firm. The advertising arrangements with plaintiff commenced with an agreement between Endicott and Guy Akins, plaintiff's sales manager. These commercials started in May of 1977, and were eventually paid for by the business. Other orders, the subject of this litigation, were placed under dates of June 9, July 1, July 25 and August 11, 1977, the last advertisement airing on September 22, 1977.

It is clear that plaintiff's representatives never ascertained the status of the entity with which it was doing business. The exhibits before us show the advertiser as "Casa Grande Mbl Home." There was some indication Gary's name came up during the initial meeting of Endicott and Akins, but there was no evidence Gary knew or approved of the various agreements until some time after the fact. As a result of his contacts with Endicott, however, Akins was left with the impression that Endicott and Gary "were in it together," and that Gary was "the head" meaning "the president, or what have you, or owner of the company."

1. The action against the corporate defendant was dismissed at plaintiff's instance after submission to the trial court.

At some point *after* the scheduling of the final, and largest, sale of advertising to Casa Grande, Endicott "disappeared" and Akins became worried. This concern resulted in a face-to-face meeting between Akins and Gary, during which the latter purportedly assured Akins "he would get it all straightened out, and take care of the bill." Although the precise time of this exchange is not fixed by the record, Gary testified he did not learn of the television advertising debts made by Endicott until late September or early October, 1977. He also denied telling anyone he would be personally liable for the debt.

It is obvious that the willingness of plaintiff to extend credit, and to make assumptions about the Garys' involvement with the mobile home operation, were based on Endicott's statements and his references to certain matters on file at the Commerce Bank of Springfield. Akins, in fact, testified the decision for approval of credit for the advertising was on the strength of a credit check at the Commerce Bank and a financial statement of the Garys located there.

The only credit check described in the testimony, however, was conducted by Don Garwitz, credit manager for a business corporation separate from plaintiff.[2] Garwitz personally went to the bank and was given ready access to certain documents relating to the Garys and Texana Casa Grande, Inc.[3] This action, by Garwitz's accounts, took place *after* the credit had in fact been extended to Casa Grande Mobile Homes, and by his recollection occurred in late summer or early fall of 1977.

In any event, Garwitz knew the bank was "floor-planning" the mobile home business and buying retail sales contracts on units sold to customers. He apparently never ascertained, however, that the bank was doing business with Texana Casa Grande, Inc. d/b/a Casa Grande Mobile Homes, to be distinguished from the Garys in their

personal capacities. Garwitz concentrated on the financial statement of W. A. Gary, and not the "other papers in the file." He understood "W. A. Gary was Casa Grande," but if he had known that Gary's involvement had been limited to the securing of bank credit for a corporate entity, it would "very definitely" have affected the credit decision of plaintiff.

In fact, all the testimonial and documentary evidence presented supports just that and no other conclusion with respect to the role of one or both of the Garys. The particular personal financial statement of the Garys was not produced in evidence, but various other documents from the bank file are before us, along with the testimony of the officer in charge of the bank's loan department. Both the documents and testimony indicate that the Texas corporation was extended a line of credit by the bank, and was the entity doing business as Casa Grande Mobile Homes.

No personal loans were ever made to the Garys. The presence of the Garys' personal financial statement is explained by the fact that a customary personal guaranty was executed by Endicott and by W. A. and Sue Gary in order for the bank "to give, and continue to give Texana Casa Grande Inc. d/b/a Casa Grande Mobile Homes . . . financial accommodations and credit . . . ." This guaranty makes no purport to apply to anything except transactions between the bank and Texana Casa Grande, Inc.

One other incident deserves mention. On October 3, 1977, an attorney's demand letter was sent to W. A. Gary regarding the advertising debt. A few days later, Gary telephoned Garwitz. According to Garwitz, Gary said he would be coming to Springfield, "and he would personally get it all taken care of." He acknowledged, again by Garwitz's account, "that he was the man behind Casa Grande, and that he would see

---

**2.** The evidence indicates there is a "very vested" degree of common ownership between plaintiff and the corporation employing Garwitz. It further appears that this common ownership had a prominent connection with the bank in question.

**3.** Both Garwitz and a Commerce Bank official conceded some irregularity in the unconsented disclosure of normally confidential materials.

that the bills were paid." Gary denied ever feeling personally obligated, and testified he refused Garwitz's request to sign a note so "we won't push any further."

On this evidence, the trial court made the following findings of fact:

"1. That Plaintiff is a corporation organized and existing under the laws of the State of Missouri with its principal place of business at 999 West Sunshine, Springfield, Greene County, Missouri.

2. That Defendants W. A. GARY and SUE GARY are residents of the State of Texas.

3. That a contract was entered into by and between the Plaintiff and Defeddants [sic] W. A. and SUE GARY, sometime during the early summer of 1977.

4. The aforesaid contract was negotiated by Giy [sic] Akins on behalf of the Plaintiff, and largely by Ted Endicott on behalf of the advertiser.

5. At the time the contract was entered into, Plaintiff and Plaintiff's officers and agents had considered W. A. GARY and his wife, SUE GARY, as affiliated and sole owners of CASA GRANDE MOBILE HOMES, a private business, not incorporated.

6. Plaintiff was aware that the GARYS were doing business in Greene County and did request financial committment [sic] or guarantee from Mr. and Mrs. Gary.

7. Mrs. Gary was doing business and personally present in Greene County.

8. That the said W. A. and SUE GARY did, in fact, carry on business in Springfield, Missouri, and did carry on business and contract with the Plaintiff.

9. That the Defendants W. A. GARY and SUE GARY, exhibited their intention to carry on business personally in the State of Missouri and to be personally liable for debts, and also to personally guarantee a separate corporate loan at the Commerce Bank of Springfield, Missouri.

10. That Mr. W. A. GARY did carry on business personally with the Plaintiff.

11. That Mr. W. A. GARY committed himself to pay the Plaintiff's bills.

12. That Mr. W. A. Gary requested advertising from the Plaintiff.

13. That although W. A. and SUE GARY furnished the financial backing for CASA GRANDE MOBILE HOMES, they employed and allowed Ted Endicott as their agent to be in full charge of day to day operations.

14. That W. A. and SUE GARY caused their personal financial statement to be given as a reference in business transactions.

15. That Plaintiff did supply television advertising, performed reasonable [sic] and satisfactorily and that the charges prayed for in their Petition are fair, just and reasonable.

16. That demand has duly been made upon Defendants W. A. and SUE GARY by Plaintiff, and even though Defendant W. A. GARY maintained that he would always pay the debt, he failed to do so and the amount prayed for was due and owing."

The court then concluded that the Garys were directly liable for breach of contract and on a theory of ratification or confirmation of "the contractural [sic] relationship." These findings and conclusions may be upheld only with great violence to the concept of corporate integrity and the necessary limitations appellate courts place on triers of fact. Some of the factual findings simply have no discernible basis in the evidence. Others might be said to be supported by the evidence, but are not legally effective to permit the result assigned to them by the court below.

To narrow the issues, we first observe there is no viable argument that W. A. Gary and Sue Gary directly contracted with plaintiff and assumed, from the initiation of the agreements sued on, personal responsibility for the same. Thus, plaintiff's principal arguments are directed to the court's apparent alternative conclusions that they are liable either on agency or ratification theories. Plaintiff devotes no argument to the latter, but urges that the Garys,

through Endicott as their agent or partner, were conducting an unincorporated business which incurred the debts at issue. In so doing, plaintiff rather gamely argues the *lack* of affirmative evidence that Casa Grande Mobile Homes was in fact Texana Casa Grande, Inc.; plaintiff also makes various conclusory statements such as "The Garys employed Endicott as their agent to sell mobile home [sic] and all three personally conducted business in Springfield."

It is elementary that the mere subjective belief of plaintiff that it was doing business with the Garys (per agent) as "sole owners of CASA GRANDE MOBILE HOMES, a private business, not incorporated" proves nothing. "An agency will not be inferred because a third person assumed that it existed." *Dudley v. Dumont*, 526 S.W.2d 839 (Mo.App.1975), quoting *Dierks & Sons Lumber Co. v. Morris*, 404 S.W.2d 229 (Mo. App.1966), and what is now 2A C.J.S. Agency § 52, p. 627 (1972). Neither is there a presumption of agency, nor can one be shown by a forced, strained or distorted construction of the facts. *Dillard v. Rowland*, 520 S.W.2d 81 (Mo.App.1974); *E. B. Jones Motor Co. v. Pullen*, 298 S.W.2d 448 (Mo.App.1957). The burden of showing Endicott's agency for the Garys by competent evidence was on the plaintiff (*Dudley v. Dumont, supra*, at 843–44), and neither its fact nor scope could be established by Endicott's own declarations. *Quinn v. Graham*, 428 S.W.2d 178 (Mo.App.1968); *Schwarze v. May Dept. Stores*, 360 S.W.2d 336 (Mo.App. 1962).

Plaintiff seems to equate the use of a business name other than the true corporate name,[4] and the fact the Garys came to Missouri a few times and tended to business interests here, as an avoidance of the corporate entity. Such is not warranted by the evidence. Indeed, there is positive indication, especially from the documents in the hands of the bank which financed the mobile home business, of a rather careful adherence to the corporate structure and intent on the part of the Garys to limit their personal entanglement.

We are reminded that a corporation must necessarily speak and act through its agents. *Standard Meat Co. v. Taco Kid of Springfield, Inc.*, 554 S.W.2d 592 (Mo.App. 1977). Endicott, either as president or manager, could undoubtedly have bound the corporation in the ordinary course of obtaining advertising. *See Willsey v. W. C. Porter Farms Co.*, 522 S.W.2d 29 (Mo.App. 1975) (president); *Standard Meat Co. v. Taco Kid of Springfield, Inc., supra*, at 595 (manager). If he went further and made some misrepresentation inconsistent with his corporate role, such was not automatically imputed to fellow officers so as to destroy their right to depend on the corporate existence. *See Wolfersberger v. Miller*, 327 Mo. 1150, 39 S.W.2d 758 (1931); *McKeehan v. Wittels*, 508 S.W.2d 277 (Mo. App.1974).

Thus, the key to placing liability on the Garys cannot be found in anything said or done by Endicott alone. Plaintiff is left to depend on the skimpy record of the Garys' activities which it hopes are sufficient to otherwise establish a personal agency or an effective after-the-fact pledge to "take care" of the debt. Although our conclusion that plaintiff extended credit, albeit unknowingly, only to Texana Casa Grande, Inc., largely disposes of the agency question, we further note plaintiff's attempt to uphold the judgment below on various theories of agency which are not nicely distinguished by brief. These arguments are in the nature of implied agency, apparent authority and agency by estoppel, none of which were pleaded.

■ It is not necessary to discuss in detail the manifold rules of law by which the existence and scope of an agency may be established. This is true because the principal in a true agency must "in some manner, either expressly or by implication

---

4. It is not clear who chose the name generally used by the business in Springfield. The use of an unregistered fictitious name violates § 417.-200, RSMo 1978, but such does not render business dealings void as regards the person or entity who nonetheless uses that name. *State v. Euge*, 400 S.W.2d 119 (Mo.1966).

from conduct for which he is responsible, appoint the agent" [2A C.J.S. Agency § 37, p. 602 (1972)]. This may be by notice or reasonable basis of suspicion of the agent's acts with knowing acquiescence by the alleged principal. *See Dierks & Sons Lumber Co. v. Morris, supra*, at 232. Likewise, an apparent agency or an agency by estoppel requires a manifestation or appearance of authority created by acts or acquiescence of the purported principal. *Dudley v. Dumont, supra*, at 845–46. The present record offers no evidence of anything done by one or both defendants with regard to the contracts at issue which either created or strongly appeared to create a personal agency on the part of Endicott. *See Ringo v. Parliament Ins. Co.*, 616 S.W.2d 869 (Mo. App.1981).

■ Furthermore, a person dealing with a supposed agent has a duty to ascertain for himself the fact and scope of agency. *Erickson v. Civic Plaza Nat. Bank of Kansas City*, 422 S.W.2d 373 (Mo.App.1967). It was only after the approval of the advertising contracts that plaintiff attempted to verify defendants' role in the enterprise. Here, plaintiff did not "display that degree of common sense which distinguishes good faith from blind faith," and with respect to whom the allocation of loss by principles of estoppel means "plaintiff's own conduct throughout the affair makes it the most obvious and inviting target." *Dierks & Sons Lumber Co. v. Morris, supra*, at 233.

Finally, we note the trial court's alternative conclusion that the Garys "did further ratify and confirm" the prior contracts "and did commit themselves to pay the accounts justly owed to and due Plaintiff." This evidently is a reference to Mr. Gary's telephone conversations with Akins and Garwitz. Plaintiff does not tell us how Mrs. Gary would be liable on this unpleaded theory in any event, nor how the rather vague recitals ascribed to Gary that he would "take care" of the debt amount to a promise to pay personally. *See Ogilvie v. Ogilvie*, 487 S.W.2d 40 (Mo.App.1972).

■ However, there is a more fundamental flaw in finding a personal contract between Gary and plaintiff on the basis of one or both of these conversations which occurred well after the agreements had been concluded between Endicott and Akins.[5] A guaranty of the payment or performance of another is a separate independent contract requiring consideration. *Bloom v. Calcaterra*, 600 S.W.2d 192 (Mo.App.1980); *Edwards v. Heidelbaugh*, 574 S.W.2d 25 (Mo.App. 1978). If the contract of guaranty occurs subsequent to the original, it must have a new and independent consideration, not merely the performance embraced in the original. *C & M Developers, Inc. v. Berbiglia*, 585 S.W.2d 176 (Mo.App.1979); *Don L. Tullis & Associates, Inc. v. Gover*, 577 S.W.2d 891 (Mo.App.1979).

■ The record is barren of any evidence of consideration for either of the "promises" of Gary.

"Consideration is a necessary element for a valid agreement and the burden of showing it is on the one claiming the benefit of the agreement. Lack of consideration to support the agreement would be a failure of that party's burden and not a defense that would avoid the agreement after its validity was established." *Ennis v. McLaggan*, 608 S.W.2d 557 (Mo.App.1980).

Thus, there is insufficient evidence to support the court's alternative basis of judgment, and we must agree with defendants' complaint of this ground of decision. *Murphy v. Carron, supra.*

There being no theory on which the trial court's judgment may be preserved, the judgment is therefore reversed and the cause remanded for entry of a judgment in favor of defendants.

MAUS, C. J., and PREWITT, J., concur.

---

**5.** It is true that a promise "to answer for the debt, default or miscarriage of another person" falls directly under the statute of frauds.

§ 432.010, RSMo 1978. However, no objection based on the statute was made by defendants prior to the appeal.