Henry L. STRAM, Appellant,

v.

Phil MILLER and Miller Feed Lots,
Inc., Respondents.

No. WD 34042.

Missouri Court of Appeals,
Western District.

Nov. 8, 1983.

Motion for Rehearing and/or Transfer to
Supreme Court Overruled and Denied
Dec. 28, 1983.

Application to Transfer Denied
Feb. 15, 1984.

M. Randall Vanet, Kansas City, for appellant.

Joseph Y. DeCuyper, Kansas City, for Phil Miller.

Timothy Bosler, Liberty, for James Miller and Miller Feed Lots, Inc.

Before CLARK, P.J., and PRITCHARD and LOWENSTEIN, JJ.

CLARK, Judge.

In this suit for breach of contract, appellant Stram sought to recover contribution from respondents Phil Miller and Miller Feed Lots, Inc.[1] for losses sustained in a joint venture for the purchase and sale of feeder cattle. A jury returned verdicts for Stram and against Phil Miller and Miller Feed Lots, each in the amount of $72,508.67. On the post trial motion of Miller Feed Lots for judgment notwithstanding the verdict, the trial court entered judgment in favor of the defendant and against plaintiff. A similar motion as to defendant Phil Miller was overruled, but a new trial was granted on the issue of damages only. Stram appeals both dispositions and also the alternative grant of a new trial to Miller Feed Lots, also limited to the issue of damages. We affirm the judgment n.o.v., rendering consideration of the new trial ordered as to defendant Miller Feed Lots moot. The grant of a new trial as to defendant Phil Miller on the issue of damages is affirmed.

The transactions among the parties ultimately generating this suit involved investments by Stram in cattle tax shelters. In a typical program, the investor, such as Stram, supplies funds which are used to purchase cattle and pay costs for feed and yard charges. The investor obtains immedi-

---

1. The original action also named James E. Miller as a defendant. At the close of plaintiff's evidence, a verdict was directed in favor of James E. Miller. No appeal from that judgment has been taken.

ate income tax benefits appropriate to individuals who have high income derived from other sources. The investor hopes to profit also when the cattle are sold.

An essential party to the cattle tax shelter arrangement is the broker who acquires the cattle, places them in feed lots and arranges for their sale at an advantageous time. The broker also is expected to hedge against losses by investment in the cattle futures market. For his services, the broker shares in any profits realized when the cattle are sold. Risk of loss is on the investor.

In 1978, Stram entered into a joint venture with respondents Phil Miller and Miller Feed Lots, Inc. to acquire, fatten and sell feeder steers. Stram was represented at the time by one James Veselich, an attorney specializing in corporation and tax law. Veselich was experienced in tax shelters and had for his own account or the accounts of clients been involved in cattle tax shelters since 1973. Stram supplied funds from his own account and from borrowed money to acquire and feed the cattle. Phil Miller, who was a cattle broker and investor, contributed his services in managing the transaction and in return, was to receive one-half of any profits. The cattle when purchased were placed in the pens of Miller Feed Lots, Inc.

Respondent Miller Feed Lots, Inc. is engaged in the business of receiving cattle from farmers, fattening the cattle for market and making them available for sale to volume consumers of beef. The corporation derives its income from a daily head charge on the stock. Phil Miller is a brother of James E. Miller, the president and principal owner of Miller Feed Lots, Inc.

The 1978 joint venture originally involved only Stram and Phil Miller. Under the proposal advanced to Stram, Phil Miller extended his guarantee that Stram would sustain no loss on his investment. This was an unusual feature of a tax shelter in the speculative area of cattle markets, but Phil Miller was confident that the circumstances in 1978 assured the parties of a profit. Veselich, however, entertained doubts that

Phil Miller had the resources to back the guarantee and he therefore suggested that Miller Feed Lots, Inc. participate. Ultimately, an agreement was prepared by Veselich and signed by all the parties including an indemnification to Stram by Phil Miller and Miller Feed Lots, Inc. against any losses. Profits were to be divided one-half to Stram and one-half to Phil Miller and Miller Feed Lots, Inc. The forecast by Phil Miller proved accurate and a profit after sale of the cattle was divided among the parties.

For the next year, 1979, Veselich engaged in negotiations with Phil Miller to arrange another cattle tax shelter for Stram. At that time, Phil Miller expressed concern about the cattle market and indicated he would not guarantee investors against loss and would accordingly reduce his share of prospective profits to one-third. As to what occurred thereafter, the testimony of Veselich who appeared as a witness for Stram and the testimony by Phil Miller are in sharp disagreement. It was, however, agreed by all of those involved that negotiation of the 1979 joint venture was conducted entirely between Veselich and Phil Miller and that the terms of agreement were never reduced to writing.

According to testimony by Phil Miller, he gave no guarantees to cattle investors in 1979 except as to a personal investment made by Veselich. The guarantee to Veselich was extended in consideration of past business for Veselich clients. Phil Miller also denied any authority to act or speak for Miller Feed Lots, Inc. in cattle tax shelter transactions. In his testimony, James E. Miller denied giving Phil Miller any authority to act as agent for the corporation and also denied any knowledge of the 1979 transaction with Stram except upon receipt of the cattle in the feed pens. Veselich, on the other hand, testified that Phil Miller verbally agreed to a 1979 joint venture with Stram on essentially the same terms as the agreement of the previous year except that Stram would be entitled to only one-third of profits and would be guaranteed against loss only to the extent of

two-thirds of his investment. Veselich testified that Phil Miller told him he had contacted his brother James and had secured his agreement also to subscribe to these terms.

The experience in the cattle market in 1979 was disastrous to investors. According to Stram, his initial investment of $150,500.00 in the 1979 venture was lost and he was also subjected to a suit and judgment by Mountain Plains Production Credit Association for a deficiency on a note. That judgment, unsatisfied as of the date of trial of this case, was in the amount of $73,338.17.

The suit here by Stram was to recover from Phil Miller and Miller Feed Lots, Inc. a two-thirds share of the above described losses, interest and fees. The basis for the claim was the oral joint venture agreement. As to Phil Miller, the cause by Stram was submitted to the jury on the fact issue of what terms had been agreed. As to Miller Feed Lots, Inc., the claim was dependent on the oral commitment made by Phil Miller and also the scope and course of an agency which permitted Phil Miller to act for the corporation. By its verdict, the jury resolved the fact issues in favor of the Veselich account of the verbal agreement, necessarily deciding that Phil Miller agreed to guarantee Stram that he would bear no more than one-third of any losses. The jury also necessarily decided by its verdict that Phil Miller was authorized to and did bind the corporate defendant to the undertaking.

The trial court in granting judgment to Miller Feed Lots, Inc. notwithstanding the verdict determined there was not sufficient credible evidence to show that Phil Miller acted within the scope and course of authority as agent for Miller Feed Lots, Inc. when he extended the guarantee to Stram. Thus, the decision by the trial court held the cause against the corporation to have been improvidently submitted to the jury.

## I. THE ISSUE OF AGENCY AUTHORITY

Stram contends first that entry of judgment in favor of Miller Feed Lots, Inc. was in error because evidence was produced sufficient to support a finding that the corporation had constituted Phil Miller its agent. Appellant does not set out in his brief or argument any particular legal theory of agency which is applicable to the facts of this case. Instead, he merely asserts that the corporation "clothed respondent Phil Miller with such agency" by its prior and subsequent dealings. We therefore undertake review of the trial court's disposition by a process of elimination considering in turn the various legal theories of agency.

▇ At the outset, we reject the theory of express agency as having no application to the facts of this case. Express agency denotes the circumstance wherein principal and agent have actually agreed between themselves to the designation of the agent. Evidence of a specific agreement is essential to prove express agency. *Dudley v. Dumont,* 526 S.W.2d 839, 844 (Mo.App. 1975). Here, both Phil Miller and James E. Miller testified there was no agreement constituting the former an agent for the corporation and Stram offered no proof to refute that evidence or any affirmative evidence that such an agreement had ever existed.

▇ Despite the absence of an express agreement, an agency may be created by conduct from which the relationship is to be inferred. Within this area is the theory of implied agency. An implied agency occurs when agent and principal have no express understanding as to the agent's appointment, but the conduct of the parties suggests the fact of an agency arrangement. Implied agency depends on facts and circumstances for which the principal is responsible, facts giving rise to the implication that the principal intended to create the agency. *Centennial State Bank v. S.E.K. Construction Co.,* 518 S.W.2d 143, 148 (Mo. App.1974). Knowing acquiescence by the principal in past acts of the purported agent is the key to implied agency. *Dudley v. Dumont, supra,* at page 845.

In the present case, Stram relies principally on the 1978 cattle tax shelter transaction as an evidentiary basis from which to infer the agency of Phil Miller. He points to the negotiations between Veselich and Phil Miller and to the ultimate agreement to which Miller Feed Lots, Inc. was a party. That transaction, however, lends no support to Stram's position. To the contrary, the inference is that Phil Miller had no authority as an agent. According to Veselich, when he inquired of Phil Miller about the corporation participating in the guarantee to Stram against losses, Miller did not purport to speak for the corporation but responded that it would be necessary for him to check with his brother. He served only as a conduit of his brother's response when he reported back to Veselich that his brother had approved the agreement on behalf of Miller Feed Lots, Inc.

Moreover, even Veselich placed no reliance on the word transmitted by Phil Miller. Instead, he prepared a written agreement, including the guarantee, which was then sent to Miller Feed Lots, Inc. and was returned signed by the corporate officers. The facts do not show any acquiescence by Miller Feed Lots, Inc. in any acts of the purported agent nor any conduct by Phil Miller as to the 1978 transaction in which he undertook to be or presented himself as one speaking for the corporation. This evidence cannot be said to demonstrate even a colorable case of implied agency.

An additional doctrine requiring consideration and elimination is the concept of agency by apparent authority. While express agency and implied agency both depend on an agreement in some form between principal and agent, apparent agency is agency imposed despite protest of both principal and agent that no agency existed. As described in *Dudley v. Dumont, supra,* p. 845, a principal who places an agent in a situation where persons of ordinary prudence are justified in presuming the agent has authority to act is estopped to deny the agent's authority. The key to apparent agency is its creation by the principal. An agency cannot be created by the mere dec-larations of the person assuming to act as an agent; there must be independent evidence of agency to give such declarations any probative force. *Erickson v. Civic Plaza Nat'l Bank,* 422 S.W.2d 373, 381 (Mo.App. 1967).

As has already been discussed, the consummation of the 1978 agreement furnishes no ground to infer that Phil Miller was empowered to act as agent for Miller Feed Lots, Inc. Instead, the separately acquired assent of the corporation to the guarantee was verbally transmitted by Phil Miller after consultation and was later formalized by the agreement document. For reasons not apparent in this record, the 1979 transaction did not follow the same format. Veselich had no contact with Miller Feed Lots, Inc. or its officers, only Phil Miller, and he sought no written confirmation of his verbal negotiations with Phil Miller.

This record supplies no proof at all that any officer or employee of Miller Feed Lots, Inc. was aware of negotiations or agreement between Veselich, Stram and Phil Miller as to the 1979 cattle tax shelter and thus there is no factual basis to argue that the corporation placed Phil Miller in a position of apparent authority. Silence of the alleged principal is not a factor for consideration unless he knowingly allows another to assume to act for him. *Dierks & Sons Lumber Co. v. Morris,* 404 S.W.2d 229, 232 (Mo.App.1966).

This case bears some similarity to *Springfield Television, Inc. v. Gary,* 628 S.W.2d 398 (Mo.App.1982) in which a creditor sought to impose personal liability on the Garys for advertising debts incurred by one Endicott for a corporation in which Endicott and the Garys were interested. The account was arranged and the debt was contracted without the knowledge of the Garys but under an impression created by Endicott that the Garys were subscribing to the obligation.

Several comments by Judge Billings are particularly appropriate here. We paraphrase. In a true agency, the principal must in some manner, either expressly

**276**

or by implication from conduct for which he is responsible, appoint the agent. This may be by notice of the agent's acts with knowing acquiescence by the alleged principal or by appearance of authority created by acts or acquiescence of the purported principal. Moreover, a person dealing with a supposed agent has a duty to ascertain for himself the fact and scope of agency and must display that degree of common sense which distinguishes good faith from blind faith. *Springfield Television, Inc. v. Gary, supra,* at page 403.

In this record, there is no evidence of anything done by Miller Feed Lots, Inc. with respect to either the 1978 or 1979 contracts which created or appeared to create any authority in Phil Miller to act as agent for Miller Feed Lots, Inc.

Stram further contends, however, that even if Phil Miller had no authority to bind the corporation to the 1979 agreement when it was made, James Miller ratified the agreement subsequently. The evidence on this point was that after the losses on the 1979 transaction had been incurred, Veselich visited James Miller at his Colorado office and gave him papers showing the net results. According to Veselich, he told James Miller the figures represented his share of the losses on the Stram program and Miller responded, "I'll have my accountant check the figures and we'll settle up." Stram argues that this response indicated acquiescence of Miller Feed Lots, Inc. in the transaction and was sufficient to sustain the verdict.

Even if it be conceded for purposes of the point that the statement made by James Miller equates with acceptance of the consequences of the 1979 agreement after the fact,[2] the theory of ratification is not viable because it was not pleaded and there was no submission to the jury under instructions to this effect. Moreover, there was no proof that James Miller was informed by Veselich or that he otherwise knew any details of the 1979 Stram agreement or the participation of the purported agent, Phil Miller. The doctrine of ratification is applicable only where it is shown that the principal had knowledge of the unauthorized promise or contract made by the agent and full knowledge of all material facts. *Dudley v. Dumont, supra,* at page 848.

For want of any substantial proof from which the jury could have found Phil Miller the agent of Miller Feed Lots, Inc., appellant made no submissible case against the corporation. The trial court correctly entered judgment for the corporation on its post-trial motion.

## II. THE ISSUE OF PROOF OF DAMAGES

In his second contention of error, Stram asserts that the order granting a new trial on the issue of damages was in error and should be reversed. That order was entered upon a finding by the trial court that proper credible evidence showing the amount of damages had not been adduced, because hearsay and irrelevant evidence had been erroneously received and because the jury had been improperly instructed on damages. Stram briefs his points in corresponding order urging that there were no errors in these subjects. By reason of the decision to affirm the judgment n.o.v. in favor of Miller Feed Lots, Inc., the points are applicable only to defendant Phil Miller and the alternative order granting a new trial to the corporate defendant on the issue of damages is irrelevant to this appeal.

To sustain the trial court in its decision to order a new trial on the issue of damages it is, of course, only necessary to find the order supported by one of the assignments of error enumerated in the order. We conclude that Stram did not adduce any substantial evidence to prove his recoverable loss and thus the other points are not addressed. It is assumed that questions of admissible evidence and the proper

2. The term "settle up" is so indefinite as to be unenforceable as an independent agreement. The guarantee must be in form so that the

precise meaning and the extent of the promisor's liability are definitely measurable. *Ogilvie v. Ogilvie,* 487 S.W.2d 40 (Mo.App.1972).

jury instructions will be dealt with on retrial in conformity with the views here expressed.

Much of the difficulty which seems to have attended Stram's effort to prove damages stems from an apparent failure to perceive the nature of the cause of action asserted and the related elements of recoverable loss. Some discussion of principles applicable to an action for breach of contract will therefore be instructive upon retrial when the question of damages is again in issue.

■ Generally, the remedies for breach of contract are for damages, for restitution and rescission or for specific performance. An action for damages may be by declaration specially on the contract or in indebitatus assumpsit as for the quantum meruit, but under either, the action for damages proceeds on the theory that the contract is still in force. 17A C.J.S. *Contracts,* § 523(1).

■ A plaintiff does not repudiate the contract when he sues in damages for the breach, but offers the contract in evidence to sustain his case. The agreed price becomes prima facie evidence of reasonable value and the plaintiff may not recover more. *Stewart v. Droste,* 294 S.W.2d 600, 603 (Mo.App.1956). Where plaintiff has fully performed and nothing remains but for the defendant to pay the price stipulated in the contract, the plaintiff may sue in assumpsit. Such cases are not limited to building contracts. *Moore v. H. Gaus & Sons Mfg. Co.,* 113 Mo. 98, 20 S.W. 975, 976 (1892).

■ In his petition, Stram sought recovery under the joint venture agreement wherein, by Stram's allegations, the defendants had agreed to assume two-thirds of the losses sustained in the cattle speculation. He was therefore suing on the contract and was necessarily limited to a recovery in conformity with whatever was proven to have been the oral agreement. The term "damages" as used to identify the claim in a breach of contract case does not include all sums which the complaining party may have lost in the transaction but such amounts as the defendants may have obligated themselves to pay by agreement. Here, therefore, the losses to be shared among the joint adventurers were, by Stram's evidence, the expenses incurred in the purchase and feeding of the cattle and other costs referable to the enterprise less the amount realized from sale of the cattle. To establish his case, Stram was obligated to sustain the burden of proving, first the terms of the oral agreement and second, the amount of the losses to which the proportion allocated to the defendants was applicable.

Proof of the terms of the oral joint venture agreement has been concluded by the jury verdict in Stram's favor. Under the agreement, Phil Miller is obligated to contribute one-third of the losses shown to have been incurred in the 1979 cattle feeding program. Because the amount of losses, if any were to be suffered, was unknown at the time the agreement was made, ascertainment of the sum Phil Miller must contribute is dependent on an accounting showing the actual results after the business of the joint venture has been concluded. This proposition leads to consideration of a separate branch of authorities applicable where a suit for breach of contract is for contribution between joint adventurers.

■ The rights of joint adventurers are governed by the rules applicable to partnerships. A joint venture has the usual attributes of a partnership except as to duration and scope which is generally but not necessarily limited to a single transaction. *Meredith Dev. Co. v. Bennett,* 444 S.W.2d 519, 521 (Mo.App.1969). The winding up of a joint venture, including an action for default in paying a proportionate share of losses, depends on an accounting and the striking of a balance which is essential to the cause of action for contribution. Unless there has been an accounting and a balance resulting from the joint venture has been struck, an action for contribution between joint ventures may not be maintained, except where the balance is readily ascertainable by a simple computation.

*Wright v. Fick,* 275 S.W.2d 607 (Mo.App. 1955).

Assuming first that the present case was one in which an accounting and the striking of a balance from the joint venture was a requirement preliminary to commencement of an action for damages,[3] the proof suggests that there was an accounting, but no evidence was introduced to show by whom the accounting was prepared, the substance and content of the accounting or the balance struck. Witness Veselich testified that he visited the office of James Miller and handed him documents which purported to show a summary of losses on which contribution was due, but those documents were not produced and Veselich, having no first hand knowledge of receipts and disbursements, was not a competent witness to prove the accounting. The evidence also suggests the inference that Mountain Plains Production Credit Association served to receive and disburse funds for the joint venture and may have had documents constituting or relevant to an accounting, but no witness from the association was called and none of their records, except a receipt issued to Stram for his initial deposit, was received in evidence.

Whether there was an accounting and a balance struck showing the results of the joint venture was left in this record to speculation and conjecture. Stram made no express allegation that an accounting was rendered preliminary to his demand for contribution and from his argument, he seems to ignore the requirement for an accounting. Other proof of his losses does not supply the omission. The only evidence touching on the results of the joint venture was evidence of Stram's initial payment of $150,500.00 to Mountain Plains Production Credit Association and a default judgment entered against Stram in favor of the association for $73,338.17. How these sums were applicable to the purchase of cattle and their maintenance in feed pens and in what manner the principal allegedly due the association by Stram was computed were the subject of no evidence whatever.

It was readily apparent from his testimony that Stram was not a competent witness to prove an accounting. He testified that he received reports from time to time but did not understand them and relied on Veselich to keep him informed. Veselich's testimony also offered no aid. While he may have maintained some records on the joint venture, none were produced. The record in fact is silent as to where or by whom books of account on the joint venture were kept, if any were maintained. An attempt to establish the net loss from the joint venture by the testimony of Veselich failed because Veselich was not shown to be a competent witness for this purpose. He offered no evidence as to the source or cost of the cattle purchased, the expenses incurred to maintain the herd or the proceeds realized when the cattle were sold. The extent of his evidence on the subject was his verification of Stram's initial payment to the production credit association and the content of the judgment entered against Stram.

This case was not one in which the jury could have determined the net loss sustained in the joint venture by a simple computation. It was therefore essential to a verdict for Stram that he prove an accounting and a balance struck as to the results of the joint venture. Proof that he deposited $150,500.00 with the credit association without supporting evidence as to disposition of the funds for purposes of the joint venture did not suffice to establish the amount as subject to contribution. In like manner, the mere proof that the association had procured a judgment against Stram did not constitute proof that the sum was even attributable to the joint venture, let alone a subject for a claim of contribution. The trial court was correct in ordering a new trial because proof of damages was lacking.

---

3. An equitable action for an accounting may be joined with a suit at law for contribution for breach of the joint venture agreement in a single action. That alternative is not applicable here because Stram purports to have the requisite accounting data and makes no claim that he is entitled to an accounting from either co-adventurer.

An additional subject relative to the elements of loss recoverable by Stram warrants comment because the issue will no doubt resurface. A part of the judgment rendered against Stram in the suit by Mountain Plains Production Credit Association consisted of interest due on Stram's note and attorney fees awarded counsel for the association in accordance with the terms of the note. Stram claims these items as a part of his "damages" and also seeks recovery for lost income he contends he could otherwise have derived from the funds had the defendants paid on demand their contribution to the losses of the venture. None of these items, which collectively amounted to more than one-fourth of Stram's claim, was properly included as part of the recovery sought under the contract.

As was noted above, the suit for breach of contract proceeds on the contract which serves as the basis for establishing the liability of the defendants. There was no testimony indicating that the co-adventures agreed to pay Stram interest on the capital he contributed or that the enterprise was affected one way or the other by Stram's choice to supply funds in part from his own resources and in part by a loan. The agreement simply was, by Stram's evidence, that he would supply the capital, Phil Miller would contribute services as broker and adviser and the pens of Miller Feed Lots, Inc. would be used to fatten the cattle.

This case is factually analogous to *Beatty v. Garner*, 458 S.W.2d 288 (Mo.1970). There, an oral agreement was made for a partnership venture in acquiring land and developing filling station locations. The evidence was that Garner was to supply the money and Beatty was to procure leases. The suit was brought for an accounting and a declaration of Beatty's interest in the assets of the venture. One point involved the claim by Garner that he was entitled to credit for interest on the sums invested. The trial court did not allow the credit and the opinion on appeal affirmed the ruling on the basis that there was no proof of an agreement to pay interest. Where one party furnishes the capital, there is no allowance for interest unless covered by an express agreement to this effect. *Beatty v. Garner,* supra, at page 292.

Stram also had no claim against Phil Miller for attorney fees attributable to the failure of Stram to pay the note obligation on demand when due. The undertaking by Stram was to supply the funds for the joint venture, it being immaterial to the cojoint adventurers from what source the funds were obtained. If, as was the fact, Stram chose to borrow the money and only he assumed to repay the debt, the joint adventurers incurred no liability on the note or any consequences of nonpayment. The addition of attorney fees to losses sustained was the result of default by Stram in payment of his debt and not to any expense of the joint venture.

The judgment entered in favor of Miller Feed Lots, Inc. notwithstanding the verdict, is affirmed. The order granting Phil Miller a new trial on the limited issue of damages is affirmed and the cause is remanded for further proceedings consistent with this opinion. Costs are assessed against appellant.

All concur.