**CARLUND CORPORATION & Capital Indemnity, Plaintiffs,**

**Forest Lake State Bank, Appellant,**

v.

**CROWN CENTER REDEVELOPMENT, J.H. Mackay Electric, W.P. Johnson, Defendants,**

**Elgard Corporation, Respondent.**

No. WD 45804.

Missouri Court of Appeals, Western District.

March 16, 1993.

Michael B. White, McDowell, Rice & Smith, Kansas City, for appellant.

Clyde Warren Curtis, Shook, Hardy & Bacon, Kansas City, for respondent.

Before TURNAGE, P.J., and BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, Judge.

Forest Lake State Bank (Forest Lake), the assignee of an account, appeals from the trial court's entry of summary judgment in favor of Elgard Corporation (Elgard), the account debtor. Forest Lake raises one point on appeal claiming that the trial court erred in awarding Elgard summary judgment because § 400.9–318(3), RSMo Cum.Supp.1992,[1] prohibited Elgard from making payments on the account in disregard of Forest Lake's security interest. The judgment is reversed and remanded for trial.

Forest Lake loaned Carlund Corporation (Carlund) $200,000 on April 24, 1989 and $40,000 on November 30, 1989. Carlund executed two promissory notes and a security agreement assigning to Forest Lake all

---

**1.** All statutory references are to Revised Missouri Statutes, Cumulative Supplement 1992, unless otherwise indicated.

of its inventory, equipment, accounts receivable and general intangibles for the repayment of any loans Forest Lake extended to Carlund.[2] Carlund defaulted on both promissory notes. Crown Center Redevelopment Corporation contracted with Elgard for Elgard to serve as the general contractor for a project at the Crown Center Parking Garage (the Project). J.H. Mackay Electric, Inc. (Mackay) was hired by Elgard to act as Elgard's primary subcontractor for the Project. Mackay contracted with Carlund for Carlund to commence work as Mackay's primary subcontractor on the Project. Carlund began work on the installation of a cathodic protection system on the gold level of the Crown Center Parking Garage.

When Elgard and Mackay became dissatisfied with Carlund's performance in mid-October of 1989, Elgard assumed responsibility from Mackay for supervising Carlund and for paying Carlund in accordance with the terms of Carlund's agreement with Mackay. Elgard terminated Carlund from the Project on or about October 31, 1989. At the time of termination, Carlund had been paid $170,000 for its work on the Project.

On November 3, 1989, Carlund submitted to Elgard a pay request and invoice in the amount of $197,137.29 for what it claimed was undisputed work completed as of October 31, 1989. The letters to Elgard and a letter to Crown Center enclosed a list of Carlund's suppliers and subcontractors and the amount payable to each. Carlund requested that Elgard or Crown Center pay amounts totaling $129,550.04 directly to its subcontractors and suppliers and pay the remaining balance of $67,587.25 to Carlund.

Forest Lake notified Elgard of its security interest in Carlund's accounts receivable in a letter dated December 22, 1989. Elgard was instructed that any further payments to Carlund were to be made jointly to Carlund and Forest Lake.

After Carlund's termination, Carlund's suppliers and subcontractors threatened to file mechanics' liens on the Project if they were not paid. One subcontractor, S & W

Waterproofing, Inc., served on Crown Center its notice of intent to file lien. Elgard initially attempted to pay Carlund's subcontractors and suppliers with checks made payable to each subcontractor or supplier, including Carlund and Forest Lake as co-payees. Carlund and Forest Lake refused to endorse the checks. On or around January 26, 1990, Elgard issued new checks which were direct payments of approximately $207,629.49 to the suppliers and subcontractors in exchange for waivers of their rights to file mechanics' liens. At the time Carlund's subcontractors and suppliers were paid by Elgard, all had provided goods and services to the Project within the previous six months.

Carlund filed suit in the Circuit Court of Jackson County, Missouri, against Crown Center, Elgard, Mackay and others. Forest Lake filed a separate two-count petition in the same cause. Forest Lake's Count II, the only count pertinent to this appeal, is a claim against defendant Elgard for recovery of the $207,629.49 it claims was wrongfully paid to Carlund's subcontractors and suppliers. Forest Lake and Elgard filed opposing motions for partial summary judgment on Forest Lake's Count II. In its amended order dated December 19, 1991, the trial court sustained Elgard's motion for partial summary judgment against Forest Lake on Count II, and expressly determined that there was no just reason for delay. Rule 74.01(b). Thereafter, Forest Lake filed this appeal.

 Forest Lake raises one point on appeal arguing that the trial court erred in awarding Elgard summary judgment because § 400.9–318(3) prohibited Elgard from making payments to Carlund or to Carlund's subcontractors in disregard of Forest Lake's security interest in Carlund's accounts receivable. Summary judgment may only be granted when there is no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. *Chapman v. Auto–Owners (Mut.) Ins. Co.*, 684 S.W.2d 335, 336 (Mo.App.1985). On appeal, the trial court's grant of summary judgment is re-

---

2. Forest Lake's position as a valid assignee is not challenged in this appeal.

viewed in the light most favorable to the party against whom summary judgment was entered. *Id.* The reviewing court must believe the evidence of the non-moving party and draw all justifiable inferences in the non-movant's favor. *American Family Mut. Ins. Co. v. Lacy,* 825 S.W.2d 306, 313 (Mo.App.1991). Under this strict standard, the trial court erred in granting Elgard summary judgment.

Forest Lake asserts that Article 9 of the Uniform Commercial Code (UCC), § 400.9–101 et seq., governs the rights and obligations of Forest Lake, Carlund and Elgard. Elgard argues in opposition that the transaction in question is not covered by Article 9 because the payments made by Elgard to the third parties did not constitute the property of Carlund. Elgard asserts three theories it urges the court to accept to find that it was entitled to pay Carlund's subcontractors and suppliers rather than Forest Lake. Elgard argues the money it paid never constituted property of Carlund because: 1) Elgard has a statutory and contractual obligation to defend and indemnify Crown Center and Elgard's surety from claims by Project subcontractors and suppliers; 2) under Missouri's lien fraud statute, § 429.014, Elgard and Carlund hold funds paid to them "in trust" for the benefit of the subcontractors and suppliers; and 3) Elgard was obligated as a constructive surety to pay the subcontractors and suppliers. Alternatively, Elgard argues that it has defenses and claims against Carlund which defeat Carlund's assignee, Forest Lake. It is Elgard's alternative argument which this court finds persuasive.

■ Section 400.9–102(1)(a) states that Article 9 applies to any transaction intended to create a security interest in accounts. The UCC Comment, in note 2, says that subsection (1)(a) covers an assignment of accounts as security for an obligation. Although the UCC Comments do not have the same force as statutes enacted by the legislature, they provide persuasive assistance in interpreting UCC provisions. *Boatmen's Nat. Bank v. Eidson,* 796 S.W.2d 920, 923 (Mo.App.1990). Section 400.9–106 defines "account" to include "any right to payment … for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance."

■ Article 9 of the UCC is applicable to the transaction in question because, under § 400.9–102(1)(a), Carlund assigned its accounts receivable to Forest Lake intending to create a security interest. Section 400.9–105(1)(a) defines an account debtor as "the person who is obligated on an account, chattel paper or general intangible." Elgard became an "account debtor" when it assumed Mackay's contractual obligation to pay Carlund for Carlund's work on the Project. After Carlund assigned its accounts receivable to Forest Lake, Forest Lake notified Elgard, in a letter dated December 22, 1989, that any further payments to Carlund were to be made jointly to Carlund and Forest Lake. These events are governed by § 400.9–318(3) which states that an account debtor must pay the assignee if it receives notification of the assignment and directions to make payment to the assignee.

■ If the analysis of the transaction ended here, then Elgard, as an account debtor, would be liable for its failure to pay the assignee, Forest Lake, since Elgard received notification of the assignment and directions to make payment to the assignee. Forest Lake, in successfully urging the application of § 400.9–318, however, also brings into play provisions of the statute other than subsection (3) upon which it relies. Specifically, § 400.9–318(1) states:

Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in section 400.9–206 the rights of an assignee are subject to

(a) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

Missouri law is well-settled that an assignee acquires no greater rights than the assignor had at the time of the assignment. *Centennial State Bank v. S.E.K. Con-*

*struction Co., Inc.*, 518 S.W.2d 143, 147 (Mo.App.1974). As a result, Forest Lake steps into the shoes of Carlund and does not occupy a better position than did Carlund. *Id.*

Carlund asserts in its petition that its agreement with Mackay was to be memorialized in writing in the form of "a standard AIA contract," but that this was never accomplished. The terms and conditions of the agreement between Carlund and Mackay are matters of fact to be determined in that portion of the case remaining before the trial court. There is no dispute by any party, however, that a term of such agreement is that Carlund promised to provide labor, material and supplies to the Project and that Carlund was obligated to pay the cost of such labor, material and supplies to protect Crown Center and Elgard from the filing of mechanics' liens. There is also no dispute that Carlund did not pay for all labor, material and supplies. Under the defense of recoupment, Elgard is entitled to deduct any amounts properly paid to discharge Carlund's indebtedness to its subcontractors and suppliers from the amount owed Carlund and Forest Lake under the contract.[3] *Freeman Contracting Company v. Lefferdink*, 419 S.W.2d 266, 275–76 (Mo.App.1967); *Clayton Brokerage Co., Etc. v. Pilla*, 632 S.W.2d 300, 305 (Mo.App.1982). The task then is to ascertain the correct amount of such recoupment. Elgard bears the burden of proving the amount it was entitled to recoup. *Freeman Contracting Co.*, 419 S.W.2d at 276. Elgard argues that it is entitled to credit for $207,629.49, which is the amount it actually paid Carlund's subcontractors and suppliers. Because Carlund and Forest Lake dispute crediting Elgard for this amount and there was not sufficient undisputed evidence to decide the issue as a matter of law, the trial court erred in finding that there was not a material question of fact regarding the correct amount for recoupment by Elgard.

The amount Elgard could pay and receive credit for against the contract price is limited to the amount that Carlund was obligated to pay under the contract, that being the amount necessary to protect Crown Center's property from mechanics' liens. Carlund by its letters of November 3, 1989, informed Elgard and Crown Center that the subcontractors and suppliers it listed had not been paid and requested that Elgard or Crown Center pay its subcontractors in the total amount of $129,550.04. Carlund and Forest Lake, as assignee, are now estopped from arguing that Elgard is not entitled to recoup the $129,550.04 Elgard paid at Carlund's request. *Jerry Anderson & Assoc. v. Gaylan Ind.*, 805 S.W.2d 733, 736 (Mo.App.1991). With regard to the $78,079.45 difference between what Elgard paid and what Carlund requested that it pay, however, there is a question of fact as to whether all payments by Elgard were for lienable claims. This issue requires resolution by the trial court. At trial, pursuant to § 400.9–318(1)(a), Elgard may recoup against Carlund and Forest Lake that portion of the $78,079.45 which was lienable.

Elgard would have avoided the risk of paying amounts to Carlund's subcontractors and suppliers in excess of lienable amounts if Carlund and Forest Lake had accepted the first set of checks Elgard made payable to Carlund, Forest Lake and the individual subcontractors and suppliers. Carlund and Forest Lake would have been compelled to come to an agreement with the subcontractors and suppliers before cashing the checks. When Carlund and Forest Lake refused to accept such checks, Elgard still could have protected itself by requiring that the subcontractors and suppliers actually file liens and pursue actions on such liens. If Elgard desired to avoid the filing of mechanics' liens on Crown Center's property, Elgard could have initiated an interpleader action to resolve disputes as to who was entitled to receive the $207,629.49, joining as defendants Carlund, Forest Lake and all unpaid subcontractors and suppliers. Because Elgard did not successfully pursue any of these courses of action, it created the possibility that it

---

**3.** Although Elgard in its answer did not specifically plead "recoupment" as an affirmative defense, its counterclaim inherently pleads the defense of recoupment. *Forsythe v. Starnes*, 554 S.W.2d 100, 107 (Mo.App.1977).

might pay an excessive amount to Carlund's subcontractors and suppliers which it might not be entitled to recoup.

The judgment is reversed and the cause remanded.

All concur.