**CITIBANK (SOUTH DAKOTA), N.A., Plaintiff–Appellant,**

v.

**Mary J. MINCKS, Defendant–Respondent.**

No. 25586.

Missouri Court of Appeals, Southern District, Division Two.

June 8, 2004.

Edward R. Spalty, Karrie J. Clinkin-beard, Kansas City, for appellant.

James V. Nichols, Lamar, for respondent.

JEFFREY W. BATES, Judge.

Citibank (South Dakota), N.A. ("Citibank") sued defendant Mary Mincks ("Mary") for breach of contract after Mary refused to make any further payments on her Citibank credit card account.[1] Mary defended on the ground that: (1) the only unpaid charges on the account related to merchandise which was never delivered by the merchant; and (2) since her Citibank credit card was used to order the merchandise, she was entitled to assert the defense of non-delivery against Citibank in its action to recover the balance due on her credit card account. After a bench trial, judgment was entered in Mary's favor. On appeal, Citibank argues that the trial court's judgment should be reversed because it was not supported by substantial evidence, and it was based on an erroneous application of the provisions of the Truth–in–Lending–Act, 15 U.S.C. 1601, *et seq.* We affirm.

## I. Standard of Review

As this was a court-tried case, our review is governed by Rule 84.13(d) and the principles articulated in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).[2] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Bean v. Bean,* 115 S.W.3d 388, 392 (Mo.App.2003). We review the evidence and all reasonable in-

---

1. We will refer to Mary Mincks and her husband, Chuck Mincks, collectively as "the Mincks." We will refer to them individually by their first names. We do so for purposes of clarity and intend no disrespect.

2. All references to rules are to the Missouri Rules of Civil Procedure (2004).

ferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Ketcherside v. McLane,* 118 S.W.3d 631, 634 (Mo.App. 2003). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Id.* Since neither party requested that the trial court prepare findings of fact, "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." Rule 73.01(c); *see also Kleeman v. Kingsley,* 88 S.W.3d 521, 522 (Mo.App.2002). Furthermore, we are primarily concerned with the correctness of the trial court's result, not the route taken by the trial court to reach that result. *Business Men's Assur. Co. of America v. Graham,* 984 S.W.2d 501, 505 (Mo. banc 1999). Therefore, the judgment will be affirmed under any reasonable theory supported by the evidence, even if the reasons advanced by the trial court are wrong or insufficient. *Id.; Professional Laundry Management Systems, Inc. v. Aquatic Technologies, Inc.,* 109 S.W.3d 200, 203 (Mo.App.2003).

## II. Factual and Procedural History

The facts in this case are relatively simple and virtually undisputed. The summary set forth below is a synthesis prepared from the pleadings, trial testimony and exhibits.

On September 18, 1999, Mary applied to have a credit card issued to her by Citibank. She filled out a document called a "Citibank Platinum Select Acceptance Form," which appears to be a typical application for personal credit. Nothing on the application indicates that credit was being sought by either a business or by an individual who intended to use the credit card for business purposes. The application listed Mary as the cardholder and showed her home address as the billing location. The form asked for the normal personal information (e.g., mother's maiden name, social security number, income) found in such personal applications. Mary applied for credit for herself, and she requested that her husband, Chuck, also be authorized to use her credit card account. The application contained the familiar exhortation, typically found in consumer credit applications, offering an introductory period of very low interest.[3] Such offers tend to encourage consumers to transfer balances from other credit cards to the new account in order to obtain the benefit of a lower rate of interest.

Mary's application was accepted, and Citibank issued a credit card to her with an $8,000 line of credit. On October 26, 1999, Mary transferred the existing balances from two other credit cards, totaling $7,213.50, to her Citibank account.[4] There is no indication in the record that these balance transfers were comprised of purchases for anything other than personal, family or household purposes.

Between November 1999 and January 2000, Mary purchased a few additional items with her credit card and made several payments on her account. Once again, nothing in the record demonstrates that these purchases were made for anything

---

3. The application contained the following statement in bold type: "To get your 2.9% APR today, call 1 800 422–5282 before 11/15/99."

4. Mary transferred the $2,432.62 balance from her AT & T card and the $4,780.88 balance from her Discover card. On Mary's October 1999 Citibank statement, the line item entry for the two transactions noted that each was a balance transfer and stated "purchase charged to lower rate."

other than personal, family or household purposes. On January 27, 2000, Mary made a large payment on her account that reduced the outstanding balance to approximately $20.00.

In February 2000, Chuck received a solicitation to order merchandise from Purchase Plus Buyers Group ("PPBG"). PPBG sold products like mailing cards, telephone cards and other similar items which could be used to promote a home business. After reviewing the solicitation, Chuck decided to order some high-definition, high-color postcards that he could use to contact potential customers for a home business that he had started about three months earlier. On February 24, 2000, Chuck placed an order with PPBG for 4,000 postcards. The order form was sent by fax from Lamar, Missouri, to PPBG's office in Westerville, Ohio. Chuck used Mary's Citibank credit card to pay the $7,600 purchase price for the postcards. The charge for this purchase first appeared on Mary's Citibank statement in March 2000.

Four weeks after placing the order, Chuck contacted PPBG by telephone to find out why he had not yet received the postcards. He was told that the merchandise was on backorder and would not be available for another month. Having no reason to doubt that explanation at the time, he waited another month. When he still had not received the postcards, he contacted PPBG again by telephone. The persons with whom he spoke were very positive and continued to assure him that he would receive the postcards in time. Thereafter, he called PPBG "innumerable times" by telephone, and PPBG personnel kept reiterating that he would ultimately receive the postcards he ordered. In mid-May 2000, Chuck first learned from PPBG that the type of postcards he ordered had been discontinued in December 1999, even

though the product continued to be offered for sale until April 2000. On May 18, 2000, he faxed a letter to PPBG requesting that he be given some other type of product that he could use since the postcards he wanted were no longer available. He received no response. He faxed the same letter to PPBG's executive committee on July 13, 2000, and again received no response.

Around August 1, 2000, Chuck decided he was never going to receive the postcards he ordered from PPBG. On August 4, 2000, he faxed a written demand for a full refund to PPBG because the company had failed to deliver either the postcards or a satisfactory alternative product. He sent this fax because he still believed he could get a refund for the undelivered merchandise. This belief changed on September 1, 2000, when he received a fax from PPBG stating the company had ceased operations and permanently closed its doors that day. Chuck knew then he would not be able to get a refund from PPBG.

On September 28, 2000, the Mincks sent a letter to Citibank. In sum, the letter provided Citibank with the following information: (1) Chuck's $7,600 postcard order from PPBG had never been delivered; (2) the charge for this order first appeared on Mary's March 2000 statement; (3) the facts showing that Chuck had made a good faith effort to resolve the issue with PPBG were recounted with considerable specificity and detail; (4) PPBG committed a breach of contract and fraud by failing to deliver the ordered merchandise and by continuing to sell a discontinued product; and (5) the Mincks were invoking their rights under Regulation Z of the federal Truth–in–Lending–Act to have their account credited in the amount of $7,600 and to have this sum charged back to PPBG.[5]

5. As used in the Mincks' letter, the term, "Regulation Z," is a collective reference to

On October 9, 2000, Citibank responded in a letter sent to Mary. Citibank took the position that it was not able to assist the Mincks because it had not received their letter "within 60 days of the disputed charge." Citibank advised the Mincks to pursue the matter with the merchant or through some alternative means available to them.

After receiving the October 9, 2000, letter from Citibank, the Mincks continued to use Mary's credit card. They made a few additional purchases with the card, and they continued to make payments on the account. That changed in February 2002, when the Mincks stopped making any payments on the Citibank account. The outstanding account balance at this time was comprised solely of the remaining amount due for the undelivered postcards ordered from PPBG, plus accrued interest and late charges.[6] Citibank continued to add interest charges, over credit limit fees, and late fees to Mary's credit card account until July 2002. As of that date, the outstanding account balance was $9,048.49.

On October 7, 2002, Citibank sued Mary for breach of contract and sought to recover the $9,048.49 then due, accrued interest at the rate of 24.99% per annum and a 15% attorney fee. Insofar as pertinent to the issues here, the petition alleged that: (1) Citibank had issued a credit card to Mary;

(2) by acceptance and use of the credit card, Mary had agreed to make the monthly payments described in the Citibank Card Agreement attached to the petition; (3) Citibank had advanced credit to Mary, through the use of the credit card, to certain persons or firms shown on her account statements; (4) Citibank had made demand on Mary to pay the amount due on her account, but she refused to do so for more than 25 days; and (5) Citibank had "paid valuable consideration to each of said issuers of the credit to Defendant [Mary], and that as consideration therefore [sic] each of said issuers of credit has assigned to Plaintiff [Citibank] the rights to receive payment evidenced in each of the transactions making up the balance due...." Thus, it is apparent from Citibank's petition that it was suing as the assignee of the individual merchants from whom Mary or Chuck had made purchases using Mary's Citibank credit card. It is also undisputed that the entire account balance which Citibank sought to recover from Mary resulted from the direct and collateral charges associated with the single $7,600 transaction in which PPBG was the merchant. In Mary's answer, she specifically asserted non-delivery of the merchandise ordered from PPBG as a defense against Citibank's claim.[7]

the provisions of the Code of Federal Regulations found in Title 12, part 226 (12 C.F.R. 226.1, et seq.). These regulations were issued by the Board of Governors of the Federal Reserve System to implement the Truth–in–Lending–Act pursuant to authority delegated by Congress. See 15 U.S.C. § 1604(a). All references to the United States Code are to the 1998 edition. All references to the Code of Federal Regulations are to the 2004 edition.

6. At trial, Mary's monthly Citibank statements from October 1999 through October 2002 were admitted in evidence. The statements show that from September 2000 through Au-

gust 2001, the Mincks used Mary's Citibank card to make $337 in new purchases. The Mincks continued to make payments on Mary's account from September 2000 through January 2002. The total amount of these payments was $2,194. The outstanding account balance shown in the January 2002 statement was $7,734.47.

7. Paragraph 3 of Mary's answer stated, in pertinent part, as follows: "[T]he goods and services purchased by Defendant were never delivered to Defendant and Defendant received nothing in consideration of the charges. Defendant notified Plaintiff of the non-delivery of the items purchased as soon

At trial, the sole dispute was whether Mary was entitled to assert PPBG's non-delivery as a defense against Citibank, which sought to recover the purchase price of the postcards as PPBG's assignee. Citibank argued that the non-delivery defense should not be permitted on two grounds. First, the PPBG postcard order, which was the only transaction at issue, was not within the scope of Regulation Z since this specific purchase was for a business or commercial purpose. Second, even if Regulation Z did apply, non-delivery of merchandise constitutes a "billing error" within the meaning of the regulation. According to Citibank, Mary lost the ability to assert non-delivery as a defense in this lawsuit because she did not give Citibank notice of this "billing error" within 60 days after the charge first appeared on her credit card statement. In response, Mary argued that Regulation Z imposed no time limit that precluded her from asserting non-delivery as a defense in Citibank's lawsuit against her, and she denied that this was a "billing error" within the meaning of the regulation. At the conclusion of the case, the trial court made the following ruling from the bench:

> I think that Reg Z does apply, and I don't think this is a—a billing error. And I think that the provision of Reg Z that allows the cardholder to assert any differences—any defenses that they could assert against the provider of the product is against the—the credit card company. Court's going to find the issues in favor of the Defendant and enter a judgment for the Defendant against the Plaintiff.

Judgment was entered in accordance with the trial court's pronouncement, and Citibank appealed.

as it was apparent to Defendant she had been defrauded. Under Federal Law, Defendant has no liability to Plaintiff. Federal Reserve

## III. Discussion and Decision

Citibank's appeal presents two points for us to decide. Each point relied on is a rescript of the arguments Citibank made below.

### Point I

In Citibank's first point, it contends the trial court erred in permitting Mary to assert PPBG's non-delivery as a defense in Citibank's breach of contract action. Specifically, Citibank argues that the trial court's judgment is not supported by substantial evidence and is based on a misapplication of the law because "Regulation Z" should not have been applied in this lawsuit, in that the PPBG transaction was primarily for a business or commercial purpose. Citibank's argument is grounded upon on two implicit premises: (1) the Truth–in–Lending–Act and its implementing regulations do not apply to this lawsuit if the single PPBG transaction at issue was for a business purpose; and (2) Mary's ability to assert non-delivery as a defense against Citibank in this contract action is derived solely from the Truth–in–Lending–Act and Regulation Z. Citibank's first point fails because neither implicit premise is correct.

### The Truth–in–Lending–Act and Regulation Z Do Apply to Mary's Open End Consumer Credit Plan

 The overall purpose of the Truth–in–Lending–Act is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit

Board Regulation Z; 12 Code of Federal Regulations 226.12(c)."

card practices." 15 U.S.C. § 1601(a). As a remedial act, the Truth–in–Lending–Act must be strictly construed against creditors and liberally construed in favor of consumers. *Stein v. JP Morgan Chase Bank*, 279 F.Supp.2d 286, 291 (S.D.N.Y. 2003); *In re Derienzo*, 254 B.R. 334, 340 (Bkrtcy.M.D.Pa.2000); *Dillard Department Stores, Inc. v. Owens*, 951 S.W.2d 915, 917 (Tex.App.1997); *Super Chief Credit Union v. Gilchrist*, 232 Kan. 40, 653 P.2d 117, 122 (Kan.1982); *Pearson v. Easy Living, Inc.*, 534 F.Supp. 884, 890 (S.D.Ohio 1981).

■ The Truth–in–Lending–Act governs a number of different types of consumer credit, including one type described as an "open end consumer credit plan." *See* 15 U.S.C. § 1637. This phrase is derived from a combination of two other statutory definitions found in 15 U.S.C. § 1602:

(h) The adjective "consumer", used with reference to a credit transaction, characterizes the transaction as one in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes.

(i) The term, "open end credit plan" means a plan under which the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance. A credit plan which is an open end credit plan within the meaning of the preceding sentence is an open end credit plan even if credit information is verified from time to time.

The designation of an extension of credit as an "open end consumer credit plan" is significant because the Truth–in–Lending–

Act and its implementing regulations specify both the nature and timing of required disclosures that must be made to the consumer before such a plan can be established. *See* 15 U.S.C. § 1637(a) (identifying the required disclosures which the creditor must make "[b]efore opening any account under an open end consumer credit plan"); 12 C.F.R. § 226.5(b)(1) (requiring the creditor to "furnish the initial disclosure statement required by § 226.6 before the first transaction is made under the plan"); 12 C.F.R. § 226.6 (identifying what must be included in the creditor's initial disclosure statement). We have previously summarized the evidence presented at trial concerning how Mary's account was established and used prior to the single PPBG purchase at issue here. We find this evidence sufficient to support the conclusion that Mary's account was an open end consumer credit plan within the meaning of the Truth–in–Lending–Act. Furthermore, Citibank's counsel forthrightly conceded during oral argument that Mary's account was this type of plan.

Since Mary's open end consumer credit plan involved the use of a credit card, the Truth–in–Lending–Act specifically preserves her right to assert defenses against Citibank arising out of the PPBG transaction. Section 1666i states, in pertinent part:

(a) Claims and defenses assertible

Subject to the limitation contained in subsection (b) of this section, a card issuer who has issued a credit card to a cardholder pursuant to an open end consumer credit plan shall be subject to all claims (other than tort claims) and defenses arising out of any transaction in which the credit card is used as a method of payment or extension of credit if (1) the obligor has made a good faith attempt to obtain satisfactory resolution of a disagreement or problem relative to

the transaction from the person honoring the credit card; (2) the amount of the initial transaction exceeds $50; and (3) the place where the initial transaction occurred was in the same State as the mailing address previously provided by the cardholder or was within 100 miles from such address. . . .

(b) Amount of claims and defenses assertible

The amount of claims and defenses asserted by the cardholder may not exceed the amount of credit outstanding with respect to such transaction at the time the cardholder first notifies the card issuer or the person honoring the credit card of such claim or defense. . . .

15 U.S.C. § 1666i. This same rule is repeated in 12 C.F.R. § 226.12(c). Hereinafter, we generically refer to the consumer protections contained in this statute and regulation as the "claims and defenses rule."

■ At the trial, Mary presented substantial evidence proving that she met each statutory element necessary to successfully assert the defense of non-delivery against Citibank under the Truth–in–Lending–Act claims and defenses rule:

1. The defense arose out of the PPBG transaction, and Mary's credit card was used as the method of payment for that purchase.
2. The Mincks made a good faith attempt to resolve the issue with PPBG.
3. The amount of this transaction greatly exceeded the $50 minimum.
4. The PPBG transaction occurred in Missouri, which is the same state as the mailing address shown on Mary's billing statements from Citibank.[8]
5. The non-delivery defense was used solely to extinguish the remaining indebtedness on Mary's Citibank account resulting from the single PPBG transaction at issue.

Therefore, we hold that the trial court committed no error in concluding Mary was entitled to assert the non-delivery defense against Citibank. The Truth–in–Lending–Act claims and defenses rule authorized Mary to assert non-delivery as a defense because her Citibank credit card account was an open end consumer credit plan, and her credit card was used to make the PPBG purchase at issue.

■ In so holding, we have given due consideration to Citibank's assertion that the Truth–in–Lending–Act claims and defenses rule does not apply because the single PPBG purchase was for a business or commercial purpose. Citibank's argument is based on the 15 U.S.C. § 1603(1), which defines what transactions are exempted from the scope of the Truth–in–Lending–Act.[9] This statute states, in pertinent part:

This subchapter [15 U.S.C. §§ 1601–1677] does not apply to the following:

**8.** Courts deem a contract to have been made where the parties to the contract perform the last act necessary to complete the contract. *Gash v. Black and Veatch*, 976 S.W.2d 31, 32 (Mo.App.1998). Here, Chuck accepted PPBG's offer to sell the postcards by (a) filling out the written order form, (b) including Mary's Citibank credit card information on the form for use as the method of payment, (c) signing the form and (d) faxing the order from Lamar, Missouri, to PPBG's offices in Ohio. Since acceptance of PPBG's offer occurred in Missouri, the contract is deemed to have been made in this state. *See Johnson Heater Corp. v. Deppe*, 86 S.W.3d 114, 119 (Mo.App.2002); *Whiteman v. Del–Jen Const., Inc.*, 37 S.W.3d 823, 831 (Mo.App.2001); *Garrity v. A.I. Processors*, 850 S.W.2d 413, 416 (Mo.App.1993).

**9.** The corresponding regulation dealing with exempt transactions is 12 C.F.R. § 226.3.

(1) Credit transactions involving extensions of credit primarily for business, commercial, or agricultural purposes, or to government or governmental agencies or instrumentalities, or to organizations.

We find this argument unpersuasive for two reasons.

First, Citibank's argument is inconsistent with the plain language of 15 U.S.C. § 1666i. When an open end consumer credit plan is involved, this statute explicitly authorizes a cardholder (*i.e.,* Mary) to assert a defense against the card issuer (*i.e.,* Citibank) "arising out of *any transaction* in which the credit card is used as a method of payment or extension of credit. . . ." 15 U.S.C. § 1666i(a) (emphasis added.) Since we are required to liberally construe this language in Mary's favor, we interpret the phrase, "any transaction," to mean exactly what it says. So long as a credit card was used to make a purchase on an open end consumer credit plan, the claims and defenses rule in 15 U.S.C. § 1666i applies to "any transaction" meeting the other requirements set forth in the statute. Any less expansive interpretation of this phrase would constitute a strict, rather than a liberal, construction of this remedial statute. We decline Citibank's invitation that we do so.

Second, Citibank's argument ignores the fact that the relevant "transaction" here was the initial extension of credit to Mary when her Citibank account was opened, rather than the specific transaction involving the postcard purchase from PPBG. We find the initial transaction controlling because it resulted in the creation of an open end consumer credit plan for Mary. It was this occurrence which inexorably led us to conclude that Mary was authorized by statute and regulation to assert non-delivery as a defense against Citibank in its lawsuit.

We believe this result is entirely consistent with the discussion of the Truth–in–Lending–Act by the United States Supreme Court in *American Express Company v. Koerner,* 452 U.S. 233, 101 S.Ct. 2281, 68 L.Ed.2d 803 (1981), upon which Citibank relies. In *Koerner,* the Supreme Court acknowledged that there can be an extension of consumer credit when an open end consumer credit account is created or renewed, as well as when individual credit card transactions occur. *Id.* at 240–42, 101 S.Ct. 2281. For the purpose of determining when the provisions of the Truth–in–Lending–Act apply, the Supreme Court described three possible alternative tests:

The language of [15 U.S.C. § 1666] does not distinguish between the two types of transactions included in the definition of "credit" or indicate which of them must satisfy the definition of "consumer" in order for the section to be applicable. There are several possibilities. The relevant extension of credit may be only the creation or renewal of the account. Under this view, adopted by the District Court, [*Koerner v. American Express Co.,* 444 F.Supp. [334] at 340 (E.D.La. 1977)], if an account is opened by a natural person, its overall purpose must be considered. If the account is opened primarily for consumer purposes, [15 U.S.C. § 1666] applies, even if the cardholder uses the card for an occasional nonconsumer purchase. On the other hand, the language might be interpreted to call for a transaction-by-transaction approach. With such an approach, [15 U.S.C. § 1666] would apply if the transaction that is the subject of the dispute is a consumer credit transaction, regardless of the overall purpose of the account. A third alternative would be to combine the two approaches by holding [15 U.S.C. § 1666] applicable to all disputes that arise under an account that is characterized as a consumer credit ac-

count as well as to any dispute concerning an individual transaction that is an extension of consumer credit, even if the overall purpose of the account is primarily a business one.

*Id.* at. 242, 101 S.Ct. 2281. The Supreme Court, however, was not required to decide which approach should be used because it determined there had not been an extension of consumer credit under any of the alternative tests.

In the case at bar, we do reach the issue which was deferred in *Koerner* and conclude that the first of the three alternatives, which we denominate the "overall purpose" test, is the one that should be used when an open end consumer credit plan is involved. Under this test, the overall purpose of an account opened by a natural person must be considered. If the account was opened primarily for consumer purposes, the statutory and regulatory framework of the Truth–in–Lending–Act applies, even if the cardholder occasionally uses the card for a nonconsumer purchase.

We find support for this conclusion in the Official Staff Interpretations of Regulation Z. *See* Supplement I to part 226, 12 C.F.R. p. 357 (1–1–04 edition). The Official Staff Commentary dealing with 12 C.F.R. § 226.3 (exempt transactions) notes that a creditor must determine in each case whether the extension of credit "is primarily for an exempt purpose." Pt. 226, Supp. I p. 369. "Examples of business-purpose credit include:.... A business account used occasionally for consumer purposes. Examples of consumer-purpose credit include:.... A personal account used occasionally for business purposes." *Id.* Therefore, we disagree with Citibank's contention that the use of Mary's Citibank credit card account to purchase nonconsumer goods on one occasion prevents her from taking advantage of the Truth–in–Lending–Act's claims and defenses rule in this case.

### Mary's Use of Non-delivery as a Defense Against Citibank Also Is Authorized by State Law

■ Even if we accepted Citibank's argument in Point I that the Truth–in–Lending–Act does not apply, our decision would not change. Like Ulysses' unfortunate sailors in *The Odyssey*, Citibank would successfully navigate past the Charybdis of federal law only to be devoured by the Scylla of state law.[10] Expressed in less metaphorical terms, the trial court's decision to enter judgment for Mary is still correct, based exclusively on Missouri common law and statutory principles. We must affirm the judgment under any reasonable theory supported by the evidence, even if the reasons advanced by the trial court are wrong or insufficient. *Professional Laundry Management Systems, Inc. v. Aquatic Technologies, Inc.,* 109 S.W.3d 200, 203 (Mo.App.2003).

Citibank brought a breach of contract action against Mary for failing to pay her credit card account. The only unpaid charge on Mary's account was the PPBG purchase. As the petition expressly acknowledged, Citibank was suing Mary as PPBG's assignee.

■ "Missouri law is well-settled that an assignee acquires no greater rights than the assignor had at the time of the assignment." *Carlund Corp. v. Crown Center Redevelopment,* 849 S.W.2d 647, 650 (Mo.App.1993); *see also Centennial State Bank v. S.E.K. Construction Co., Inc.,* 518 S.W.2d 143, 147 (Mo.App.1974).

---

**10.** Homer, *The Odyssey,* Book XII (800 B.C.) (Samuel Butler trans.). A more homespun Homer from the Ozarks might describe Citibank's situation as being caught between a rock and a hard place.

As a result, Citibank stands in PPBG's shoes and can occupy no better position than PPBG would if it sued Mary directly. *Doss v. EPIC Healthcare Management Co.*, 901 S.W.2d 216, 222 (Mo.App.1995); *Carlund*, 849 S.W.2d at 651. These common law principles compel the conclusion that any defense valid against PPBG is valid against its assignee, Citibank. *Doss*, 901 S.W.2d at 222; *Rizzo Motors, Inc. v. Central Bank of Kansas City*, 825 S.W.2d 354, 357 (Mo.App.1992).

 The same is true under Missouri statutory law. Article Nine of the Uniform Commercial Code describes a person obligated on an account as an "account debtor." Section 400.9–102(a)(3).[11] Section 400.9–404(a)(1) states that the rights of an assignee of an account debtor are subject to "any defense or claim in recoupment arising from the transaction that gave rise to the contract...."[12] The official Comment explains that this subsection of the statute "provides that an assignee generally takes an assignment subject to defenses and claims of an account debtor. Under subsection (a)(1), if the account debtor's defenses on an assigned claim arise from the transaction that gave rise to the contract with the assignor, it makes no difference whether the defense or claim accrues before or after the account debtor is notified of the assignment."[13] Therefore, without regard to the provisions of the federal Truth–in–Lending–Act, Missouri law gave Mary a common law and statutory right to assert any defense against Citibank that she could have asserted against its assignor, PPBG.

Assuming PPBG had sued Mary for breach of contract and sought to recover the cost of the postcards, would she have had a valid defense against that claim? We answer this question affirmatively because PPBG never delivered the merchandise for which Mary was charged. *See Associated Bearings Co. v. Southwest Latex Supply, Inc.*, 962 S.W.2d 918, 919 (Mo. App.1998) (in an action to recover on an account, the plaintiff must prove that the defendant requested plaintiff to furnish merchandise or services, plaintiff accepted defendant's offer by furnishing such merchandise or services, and the charges were reasonable); *Professional Laundry Management Systems, Inc. v. Aquatic Technologies, Inc.*, 109 S.W.3d 200, 204 (Mo.App. 2003) (judgment that seller's nonperformance constituted a breach of contract would be upheld based on evidence showing seller failed to deliver vast majority of contracted items). This defense is just as effective against Citibank as it would have been against PPBG.

Regardless of whether the trial court's decision is reviewed by using the federal Truth–in–Lending–Act or state law standards, the judgment is correct. The trial court committed no error by ruling in Mary's favor and denying Citibank any

---

**11.** All references to Missouri statutes are to RSMo (Cum.Supp.2002).

**12.** Recoupment may be asserted "as a purely defensive matter going only to the reduction or satisfaction of the plaintiff's claim." *RPM Plumbing Mechanical, Inc. v. Jim Plunkett, Inc.*, 46 S.W.3d 60, 62 (Mo.App.2001). *See also Boone Nat. Sav. & Loan Ass'n, F.A. v. Crouch*, 47 S.W.3d 371, 376 n. 4 (Mo. banc 2001) (the object of recoupment is to rebate or recoup in whole or part the claim sued on).

**13.** Uniform Commercial Code Comment to § 400.9–404, 20C V.A.M.S. p. 524 (2003). Although comments to the Uniform Commercial Code do not have the same force as statutes enacted by the legislature, they provide persuasive assistance in interpreting U.C.C. provisions. *Carlund Corp. v. Crown Center Redevelopment*, 849 S.W.2d 647, 650 (Mo.App. 1993).

recovery on its action for breach of contract. Citibank's first point is denied.

### Point II

In Citibank's second point, it contends the judgment is not supported by substantial evidence and is based on a misapplication of the law because, even if Regulation Z does apply, PPBG's non-delivery of the postcards constituted a "billing error" within the meaning of the regulation. Assuming that to be true, Citibank then argues Mary could not avoid responsibility for the PPBG purchase unless she gave Citibank notice of the error within 60 days after the charge first appeared on her credit card statement. According to Citibank, failure to invoke the billing error provisions of the Truth–in–Lending–Act prohibits a consumer from thereafter relying on the claims and defenses rule if he or she is sued on the debt by the creditor.

The relevant statutory and regulatory provisions of the Truth–in–Lending–Act dealing with billing errors are found in 15 U.S.C. § 1666 and 12 C.F.R. § 226.13. Hereinafter, we generically refer to the consumer protections contained in this statute and regulation as the "billing error rule." The billing error rule gives a consumer the right, upon proper written notice, to request correction of billing errors. The notice must be received within 60 days after the creditor has sent the consumer a statement reflecting a billing error. *See* 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(b). If the consumer properly invokes the billing error rule by giving timely written notice, the creditor is required to investigate the claim. 15 U.S.C. § 1666(a); 12 C.F.R. § 226.13(b) and (c). While the investigation is pending, the consumer may withhold payment of the disputed sum, and the creditor is prohibited from both collection and adverse credit reporting activity. 15 U.S.C. § 1666(c);

12 C.F.R. § 226.13(d). As defined in 15 U.S.C. § 1666(b)(3) a billing error includes "[a] reflection on a statement of goods or services . . . not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction." Essentially the same definition of a billing error is found in 12 C.F.R. § 226.13(a)(3).

■ The trial court concluded that PPBG's failure to deliver the postcards did not constitute a "billing error" within the meaning of 15 U.S.C. § 1666 and 12 C.F.R. § 226.13. We interpret this decision to be a rejection of Citibank's position that the 60 day time limit for giving written notice began running in March 2000 when the PPBG charge first appeared on Mary's statement because the Mincks did not know, during any portion of this 60 day period, that they would never receive the postcards, an acceptable substitute product, or a refund from PPBG. In order to dispose of Citibank's second point on appeal, however, it is unnecessary for us to decide whether this ruling was in error. Assuming PPBG's non-delivery of the postcards did constitute a "billing error" within the meaning of the Truth–in–Lending–Act, Mary still was entitled to invoke the claims and defenses rule in 15 U.S.C. § 1666i and 12 C.F.R. § 226.12(c). This statute and regulation are stand-alone provisions that operate independently of 15 U.S.C. § 1666 and 12 C.F.R. § 226.13, which give a consumer separate and distinct rights and remedies when seeking to correct a billing error. We find support for our conclusion through a textual analysis of 15 U.S.C. § 1666 and an examination of the Official Staff Interpretations of Regulation Z.

■ The only obligation imposed upon a consumer by 15 U.S.C. § 1666 is the transmittal of an adequate written notice to the creditor within 60 days after receiv-

ing a statement containing a billing error.[14] Once the billing error process is properly initiated, the consumer may withhold payment of the disputed sum and obtain an abatement of collection and adverse reporting activity while the creditor investigates the issue. Nothing in the statute affirmatively imposes any penalty on the consumer for failing to take advantage of the benefits of this statute. The only penalty which can even be inferred is the loss of the abatement rights contained therein. We accept as accurate the way in which the Texas Court of Appeals summed up the purpose of 15 U.S.C. § 1666:

> The purpose of the protections afforded a consumer under section 1666 is not, after all, to change the substantive law with regard to his liability for the underlying debt, but to protect him from the intimidating process of bargaining over a disputed debt with a creditor in a superior bargaining position. Without such protections, the creditor may use that bargaining power to encourage payment of even an illegitimate debt by threatening to force the consumer to expend substantial time and money to protect his rights.

*Dillard Department Stores, Inc. v. Owens*, 951 S.W.2d 915, 918 (Tex.App.1997).

In contrast, the statute does affirmatively impose a penalty upon a *creditor* that ignores the provisions of this statute. This conclusion follows from 15 U.S.C. § 1666(e), which states:

> (e) Effect of noncompliance with requirements by creditor
>
> Any creditor who fails to comply with the requirements of this section or section 1666a of this title forfeits any right to collect from the obligor the amount indicated by the obligor under para-

graph (2) of subsection (a) of this section, and any finance charges thereon, except that the amount required to be forfeited under this subsection may not exceed $50.

Thus, § 1666 only affects the amount of the debt in the event of a creditor's noncompliance with the statute. When this occurs, however, the creditor may still sue on the debt if there is a remaining balance due after subtracting the $50 forfeiture sum. If we were to accept Citibank's argument, it would mean that a consumer who failed to utilize this billing error statute—through ignorance, inadvertence, or purposeful action—would completely forfeit his right to contest the debt owed in a collection lawsuit. The creditor, on the other hand, could knowingly and willfully ignore its responsibilities under this statute and only be penalized a maximum of $50. In our view, this interpretation of the statute leads to an absurd result and turns topsy-turvy our duty to liberally construe the Truth–in–Lending–Act in a consumer's favor. Again, we decline to do so.

Our construction of how the billing error rule operates also is supported by the Official Staff Interpretations of Regulation Z. As the United States Supreme Court stated in *Ford Motor Credit Company v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980):

> At the very least, ... caution requires attentiveness to the views of the administrative entity appointed to apply and enforce a statute. And deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless demonstrably irrational, Federal Reserve Board staff

---

**14.** The notice must identify the consumer by name and account number, indicate that a billing error has occurred and what the amount of the error is, and explain why the consumer believes the charge is a billing error. 15 U.S.C. § 1666(a)(1–3).

opinions construing the Act or Regulation should be dispositive . . . .

*Id.* at 565, 100 S.Ct. 790. We wholeheartedly agree. In this very specialized area of law governing commerce in credit, we believe the Federal Reserve Board's interpretation of the Truth–in–Lending–Act and its implementing regulations are entitled to substantial deference as we analyze the issues presented in Citibank's appeal.

The regulation dealing with a consumer's right to correct billing errors is 12 C.F.R. § 226.13. The regulation dealing with a consumer's right to assert claims and defenses is 12 C.F.R. § 226.12. The Official Staff Commentary for 12 C.F.R. § 226.12 states, in pertinent part:

> *12(c) Right of cardholder to assert claims or defenses against card issuer.*
>
> 1. *Relationship to § 226.13.* The § 226.12(c) credit card "holder in due course" provision deals with the consumer's right to assert against the card issuer a claim or defense concerning property or services purchased with a credit card, if the merchant has been unwilling to resolve the dispute. Even though certain merchandise disputes, such as non-delivery of goods, may also constitute "billing errors" under § 226.13, that section operates independently of § 226.12(c). The cardholder whose asserted billing error involves undelivered goods may institute the error resolution procedures of § 266.13; but whether or not the cardholder has done so, the cardholder may assert claims or defenses under § 226.12(c). Conversely, the consumer may pay a disputed balance and thus have no further right to assert claims and defenses, but still may assert a billing error if notice of that billing error is given in the proper time and manner. An assertion that a particular transaction resulted from unauthorized use of the card could also be both a "defense" and a billing error.

*See* Pt. 226, Supp. I p. 419. Thus, the Federal Reserve Board recognizes that the claims and defenses rule operates independently of the billing error rule. As the Board's analysis of the proper relationship between these two different rules and their respective remedies is not demonstrably irrational, we accept it as dispositive here.

For all of the foregoing reasons, we reject Citibank's argument that a consumer's failure to give a creditor timely notice of a billing error precludes the consumer from later invoking the claim and defense provisions of 15 U.S.C. § 1666i and 12 C.F.R. § 226.12(c) if the creditor sues on the debt. Citibank's second point is denied.

## IV. Conclusion

Mary was entitled to assert non-delivery as a valid defense against Citibank in its action for breach of contract. The use of this non-delivery defense was authorized both by the Truth–in–Lending–Act and by state law. Furthermore, the use of this defense was not precluded by the billing error rule found in the Truth–in–Lending–Act. Therefore, the trial court ruled correctly when it denied Citibank any recovery and entered judgment in Mary's favor. The judgment is affirmed.

PARRISH and SHRUM, JJ., Concur.