KONENKAMP, Justice.
[¶ 1.] In this collection action, a debtor representing himself advances several dubious legal theories on why he should not be responsible for paying his entire credit card debt. In circuit court, a judgment was entered against him for the whole amount. Despite some of the debtor’s questionable arguments, however, it appears that he was in fact defrauded in a telemarketing swindle. Therefore, part of his debt must be reexamined. We affirm in part, reverse in part, and remand for further proceedings.
Background
[¶ 2.] Wayne E. Schmidt of Mobridge, South Dakota, entered into a credit card agreement with Citibank of South Dakota, N.A. He incurred charges on his card and, for a while, made monthly payments on his account. From July through September 2004, Schmidt used his card for five transactions with an entity in New York calling itself New World Coin and Rarities (New World). It turned out to be a scam. According to the United States Attorney for the Eastern District of New York, New World was a racket operated as a rare coin investment scheme, targeting the elderly. To persuade the victims to buy “rare” coins, which were in reality worthléss or nonexistent, telemarketers fraudulently told their elderly prey that the coins they purchased could be resold at substantially greater prices in Europe and that the company would facilitate those resales. As explained by the United States Attorney, “[t]he victims in this case, thinking they were making wise investments based on information provided by the operators of this boiler room, New World Coin and Rarities, tossed their fife savings away to the tune of over one million dollars.” Two prime defendants, Steven and Thomas Fasano, indicted on fraud charges in connection with this scheme, pleaded guilty in United States District Court in April 2005.[1]
*831 [¶ 3.] Schmidt claimed that his account should not be charged for these transactions because he was defrauded. In response, Citibank issued conditional credits and reviewed his claim. After, its review, Citibank credited Schmidt with $4,000, but it ruled that the remaining New World charge of $7000 was “valid.” Still, insisting that he was not responsible for the New World transactions or, for that matter, any other of his charges, Schmidt stopped making payments on his account.
[¶ 4.] Citibank declared the entire account balance of $19,279.65 due and owing and brought suit to recover the debt, along with its attorney’s fees and costs. When Citibank moved for summary judgment, Schmidt, who represented himself, appeared in court with certain documents, which the circuit court treated as his response. Schmidt later submitted an affidavit after the court gave him additional time. One document Schmidt offered was a Better Business Bureau report about New World being shut down after fraud charges were brought against its owners. One other document Schmidt provided was an arbitration award against Citibank from another dubious entity, Dispute Arbitration Resolution Group. Deeming this “award” to be invalid, the circuit court gave no credit to it and granted summary judgment for Citibank. Schmidt appeals.
Analysis and Decision
[¶ 5.] As in circuit court, Schmidt, who claims he cannot afford a lawyer, represents himself in this appeal. His submissions make it difficult at first to fathom exactly what happened. But now armed with the federal court materials on how the rare coin scheme worked, we can piece together the circumstances. Schmidt told the circuit court that he had a package deal with New World that was never consummated. He gave the court a copy of a 2004 “contract” he made with a company purported to be in London, United Kingdom, to sell certain coins for $131,900. According to Schmidt, he agreed to purchase these coins from New World only on the condition that New World “would resell the coins” to Winston Rarities of London, undoubtedly a nonexistent company. As detailed by the United States Attorney in New York, victims were induced to buy bogus rare coins by advising them that a bid had already been received for the purchase of the victim’s coins at a substantial profit to the victim. Based on our present knowledge of events, we can deduce that the coins Schmidt bought, which he denies receiving, were worthless in any event. Citibank obviously saw some merit in Schmidt’s plight because it credited his account with $4,000 of the $11,000 charged by New World.
[¶ 6.] Schmidt never filed a formal answer. to Citibank’s complaint, but he did file a responsive letter, which the circuit court took as his answer. In the letter, Schmidt explained that he was persuaded to purchase coins from New World, which he never received. Also, at the invitation of the circuit court, Schmidt later filed an affidavit in response to the affidavits filed by Citibank. In this affidavit, Schmidt reiterated that “he has not received any of the coins for which New World Rarities has charged his account $11,000....” The circuit court considered Schmidt’s responses inadequate to preclude summary judgment.
[¶ 7.] Schmidt now argues that South Dakota courts should be required to explain procedures like summary judg *832 ments to civil defendants who represent themselves. If people choose to appear in court on their own, they must familiarize themselves with the procedures and laws governing their cases. Judges cannot ethically advise litigants on how to advocate their positions. In view of the increasing number of pro se litigants, however, the Unified Judicial System now provides legal guides for people who want to represent themselves in court. See “A Guide for Representing Yourself in South Dakota Courts,” Form UJS-300 Rev. 07/2007, available at www.sdjudicial.com. As explained in this publication, court staff cannot “[g]ive advice or information to one party over another or take sides in a case.”
[¶ 8.] It should be unmistakable to lawyers and laypersons alike that when facing a motion for summary judgment, the opposing party must “be diligent in resisting [the motion], and mere general allegations and denials which do not set forth specific facts will not prevent the issuance of a judgment.” Bordeaux v. Shannon County Schools, 2005 SD 117, ¶ 14, 707 N.W.2d 123, 127 (quoting Hughes-Johnson Co. v. Dakota Midland Hosp., 86 S.D. 361, 364, 195 N.W.2d 519, 521 (1972)); see also SDCL 15-6-56(e); Chem-Age Industries, Inc. v. Glover, 2002 SD 122, ¶ 18, 652 N.W.2d 756, 765. On appeal, we will affirm summary judgment when the facts and law are clear and no genuine issues of material fact exist. Bordeaux, 2005 SD 117, ¶ 11, 707 N.W.2d at 126 (citations omitted). Despite Schmidt’s claim that he was not informed of his rights, the record shows that, within the bounds of judicial ethics, the circuit judge did explain to Schmidt the basic rules applicable to summary judgments. Schmidt answered that he understood what the judge had explained. The judge also allowed Schmidt to submit, after the hearing, certain documents as his response, when normally responses to a motion for summary judgment must be submitted before the hearing.
[¶ 9.] Illustrating too well perhaps the pitfalls of self-representation, Schmidt advances a perplexing array of contentions having little or no relation to the issue in this case. These claims need not be repeated here. Most of them have been found meritless by numerous courts around the country, and Schmidt cites no legal authority to conclude otherwise.
[¶ 10.] We will address, nevertheless, two of Schmidt’s more peculiar theories on why he should not have to pay any of his credit card debt. Schmidt presented the circuit court with an arbitration award from an operation in Las Vegas, Nevada, called Dispute Resolution Arbitration Group (DRAG). Schmidt contends that this award concludes the matter in his favor. The award was based on information only Schmidt provided. Citibank did not participate. The “arbitrator” heard one side of the case and concluded that Citibank committed, among other things, “ultra vires conduct” and deceptive trade practices. As a result, the “award” not only eliminated Schmidt’s entire debt, but also granted him a large monetary sum against Citibank. Attached to Schmidt’s reply brief is a letter from DRAG. The letter gives considerable insight into the devious nature of this outfit. It states,
For those individuals who feel they should pay for what they’ve used (such as credit card purchases or student loans), please let me remind you that the bank’s purpose is to keep people in debt through deceit. So I submit to you, why should you pay on something that was secured by their intentional failure to disclose the true terms of your debt?
DRAG claims that it will “eliminate the debt” and “show a positive credit rating on [the] eliminated accounts[.]” Its printed *833 material also states: “Set Yourself Free! It has worked flawlessly for thousands of people and it will work for you!” DRAG delivered as advertised: its “arbitration award” against Citibank was predetermined.
[¶ 11.] We do not know what, if anything, Schmidt paid for his “arbitration.” In the end, however, it becomes obvious that to avoid his loss from one fraud, Schmidt fell into the clutch of another. Whether he was truly a victim of this counterfeit arbitration, or whether he was a willing participant, we cannot discern from the record. In any event, a court is entitled to vacate an arbitration award procured by fraud. SDCL 21-25A-24(1). The circuit court rightly gave no credence to DRAG.[2]
[¶ 12.] By far the most bizarre of Schmidt’s claims is that he should not have to repay his entire credit card debt because Citibank “monetized” his signature. In his view, through the device of signature “monetization,” his credit card charges, in whatever amount, have already been paid in full. In reading the literature Schmidt submitted in court from the purveyors of DRAG, it appears that this flum-mery came from them. In any case, no matter what the term “monetize” may mean in financial parlance, in the context of this case, it is utter gibberish.
[¶ 13.] When Citibank brought its motion for summary judgment, it presented an affidavit and documentary evidence that Schmidt had a valid account with Citibank, made charges, and failed to make payment on those charges. With respect to the New World charges, at the summary judgment hearing counsel for Citibank argued that although Schmidt did timely notify Citibank that he disputed the $11,000 in charges to his account, his claim could not be honored because, in accord with the credit card agreement, Schmidt “must have made the purchase in [his] home state or, if not within [his] home state, within 100 miles of [his] current address.”[3] Schmidt’s response, larded though it was with irrelevancies, managed to outline the fact that he was defrauded by telemarketers who were later arrested and indicted, and that he had timely protested the charges on his credit card. Obviously, he did not present his case with the precision of a seasoned lawyer, but that is not our standard.
[¶ 14.] Despite Schmidt’s unskilled advocacy, there appears to be genuine issues of material fact precluding summary judgment. See SDCL 15-6-56(e). *834 “Summary judgment is an extreme remedy and should be awarded only when the truth is clear and reasonable doubts touching the existence of a genuine issue as to material fact should be resolved against the movant[.]” S.D. Dept, of Rev. v. Thiewes, 448 N.W.2d 1, 2 (S.D.1989) (citing Wilson v. Great Northern Ry. Co., 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968)). Even a poorly self-represented litigant deserves fair treatment, especially considering that the burden of proof is on Citibank, as the party moving for summary judgment, and the “benefit of any doubt” on whether there is a material issue of fact goes to Schmidt, as the nonmoving party. See Trammell v. Prairie States Ins. Co., 473 N.W.2d 460, 462 (S.D.1991).
[¶ 15.] Acknowledging the arrant fraud perpetrated against Schmidt in the New World swindle, and the fact that these charges were presented to the circuit court as a billing dispute, we remand for further proceedings to determine what amount, if any, Schmidt owes Citibank on those charges. Along with any other applicable state and federal laws, the circuit court should consider the Truth in Lending Law, codified in the Consumer Credit Protection Act, 15 USC §§ 1601-1700; Truth and Lending Reg. Z, 12 CFR §§ 226.1-226.36; and the Fair Credit Billing Act, 15 USC §§ 1666-1666j.
[¶ 16.] On the other hand, Schmidt has no valid defense for not paying his remaining credit card charges incurred for everything except the New World transactions. Accordingly, Citibank’s judgment against Schmidt on all claims for credit card charges other than from New World are affirmed.
[¶ 17.] Affirmed in part, reversed in part, and remanded.'
[¶ 18.] GILBERTSON, Chief Justice, and SABERS, Justice, concur.
[¶ 19.] ZINTER and MEIERHENRY, Justices, concur in part and dissent in part.

. Schmidt supplied only a disjointed assortment of details to the circuit court. Additional information we take judicial notice of from the docket of the United States District Court *831 for the Eastern District of New York, and the United States Department of Justice website at http://www.usdoj.gov/usao/nye/pr/2005/ 2005jan20.html. See SDCL 19-10-2(2) (Rule 201(b)(2)); SDCL 19-10-3 (Rule 201(c)).

. A federal district court in Nevada recently entered an injunction against DRAG and found its owner, Mark Swanson, liable for civil conspiracy, intentional interference with contractual relations, and defamation, all in connection with these fake arbitration awards. Chase Bank USA, N.A. v. Dispute Resolution Arbitration Group, 2007 WL 1577853 (D.Nev. May 31, 2007) (unpublished).

. We have never examined the implications of a 100-mile limit in a credit card clause. Nothing in the record indicates whether the circuit court specifically ruled on it. Should it apply in a case of pure fraud? If it does apply, some jurisdictions have established a limitation on its application. They have con-eluded that whether a transaction occurred within 100 miles of the cardholder’s resident address depends entirely on where the contract was formed. In re Standard Financial Management Corp., 94 B.R. 231, 238 (Bkrtcy.D.Mass.1988); Citibank (South Dakota), N.A. v. Mincks, 135 S.W.3d 545, 554 n. 8 (Mo.Ct.App.2004); Singer v. Chase Manhattan Bank, 111 Nev. 289, 890 P.2d 1305, 1306-07 (1995). We know this was a telemarketing scam. If a contract was deemed to have been formed in a cardholder's resident state, the 100-mile limitation will not apply. The full extent of the fraud and the possible implications of the 100-mile rule implicate genuine issues of material fact.